721 A.2d 344

COMMONWEALTH of Pennsylvania, Appellee,

v.

Antyane ROBINSON, Appellant.

Supreme Court of Pennsylvania.

Argued April 28, 1998.

Decided Nov. 24, 1998.

Reargument Denied Jan. 26, 1999.

294

300

Arla M. Waller, Ellen K. Barry, Carlisle, for A. Robinson.

M.L. Ebert, Jr., Jaime M. Keating, Carlisle, for the Com.

Robert A. Graci, Harrisburg, for Office of Atty. Gen.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

CAPPY, Justice:

This is a direct review of a sentence of death imposed by the Court of Common Pleas of Cumberland County. Following a jury trial, appellant, Antyane Robinson, was found guilty of first degree murder,[1] attempted criminal homicide,[2] aggravated assault,[3] committing a crime with a firearm,[4] and concealing a firearm on his person or in his vehicle without a license.[5] During the penalty phase, the jury found two aggravating circumstances: (a) the appellant knowingly created a grave risk of death to another[6] and (b) the appellant committed a killing while in the perpetration of a felony.[7] The jury also

1. 18 Pa.C.S. § 2501 and 2502.
2. 18 Pa.C.S. § 901, 2501, and 2502.
3. 18 Pa.C.S. § 2702(a)(1).
4. 18 Pa.C.S. § 6103.
5. 18 Pa.C.S. § 6106.
6. 42 Pa.C.S. § 9711(d)(7).
7. 42 Pa.C.S. § 9711(d)(6).

found two mitigating circumstances: (a) the youth of appellant [8] and (b) appellant's future contributions to society.[9] The jury concluded that the aggravating circumstances outweighed the mitigating circumstances and returned a verdict of death.[10] At the sentencing hearing the trial judge formally imposed the sentence of death for first degree murder and 6 years, nine months to 20 years for aggravated assault, which sentence is to run consecutively with the sentence of death.

Although appellant does not raise a sufficiency of the evidence claim with regard to the first degree murder conviction, we must nevertheless review the record to determine if there was sufficient evidence to sustain the conviction of first degree murder. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). In reviewing the sufficiency of the evidence this court will consider whether the evidence and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as the verdict-winner, would permit a jury to find that all the elements of the crime were present beyond a reasonable doubt. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129 (1996). In the case of first degree murder, this court must examine whether there was sufficient evidence to support the finding that appellant caused the death of another human being by an intentional killing.

A review of the record reveals that the evidence was more than sufficient to support the verdict of first degree murder. Appellant dated Tara Hodge on and off during the time period beginning in early 1993 until February 1995, when Hodge discovered that appellant had another girlfriend. They did not see each other for over a year, until March 30, 1996, when appellant re-established an intimate relationship with Hodge. Between March 30, 1996 and the night of the incident in question, Hodge was with appellant for one night on both March 30 and April 30, four days between May 10 and 13, and

8. 42 Pa.C.S. § 9711(e)(4).

9. 42 Pa.C.S. § 9711(e)(8)—the catchall section.

10. 42 Pa.C.S. § 9711(c)(1)(iv).

one night on June 1, 1996. Hodge met Rashawn Bass on May 26, 1996, after she responded to a personal ad in the local paper. On June 10, 1996, Hodge broke off the relationship with appellant by letter.

On the evening of June 29, 1996 Hodge worked the 2 p.m. to 10 p.m. shift at Wal–Mart. Following her shift, Hodge met Bass at her apartment, located in Carlisle, Pennsylvania, where they had a pizza delivered. After eating the pizza, Bass took a shower. Shortly after midnight, while Bass was in the shower, appellant arrived at the apartment of Tara Hodge. Hodge let him into her apartment. Upon finding that Hodge had a guest at her apartment appellant and Hodge had an argument. Appellant requested that Hodge ask Bass to leave. When Hodge refused to ask Bass to leave, appellant pulled a gun out of his "sweats," which he pointed at Hodge and shot her. Hodge heard three shots. Appellant ran by Hodge, and she fell to the floor, unconscious.

At about 1 a.m. on the morning of June 30, 1996, Hodge regained consciousness in a pool of her own blood. She then entered the bathroom where she saw that Bass was dead inside the shower stall. She was able to drag herself to her next door neighbor's home. The police arrived at the neighbor's house and saw that Hodge had a head wound. Unable to speak, Hodge wrote a note directing the police to her apartment. The ambulance arrived and took Hodge to the hospital. The officer went to Hodge's apartment and found Bass' body in the shower. After leaving the apartment, the officer went to the hospital to speak with Tara Hodge. At the hospital, Hodge identified appellant as the person who had shot her.

Rashawn Bass had been shot seven times and died almost instantly from multiple gunshot wounds. Bass was shot in the ear, the left side of his head, his upper and lower right chest, the lower left chest, the side of his left arm, and the back of his right hand. Twelve empty 9 millimeter shell casings were found in the apartment. The bullets from the empty shell casings were all fired from the same gun, which was manufactured by one of four possible companies, one of which was Lorcin. In Tara Hodge's apartment, the police found a note-

book containing appellant's pager number. Following this, the police obtained an arrest warrant charging appellant with criminal homicide of Rashawn Bass, attempted criminal homicide of Tara Hodge and other related charges. The arrest warrant was forwarded to Prince George's County, Maryland, where appellant was residing at his parents' home. The following day, July 1, the Prince George's County police paged appellant. Twenty minutes later, appellant returned the call from a local shopping center. The police did not answer the call, but proceeded directly to the shopping center where they observed appellant playing video games. The police then arrested appellant at 4:00 p.m.

At the time of arrest, appellant identified himself as Joseph Smith. The police took appellant to the homicide unit of the Prince George's County police department, where they were met by Detective David Fones and Corporal Hayes of the Carlisle police department at 5:30 p.m. They identified themselves to the appellant as police officers from the Borough of Carlisle and told him they wished to question him about an incident that occurred there. Appellant was advised of his Miranda rights and signed a written waiver. Appellant told police that he had last been in Carlisle at the end of May or beginning of June. In response to whether he knew anyone in Carlisle, appellant stated that he knew Tara Hodge and her family. Appellant also told police that he had spent June 29 through the afternoon of June 30 in Washington, D.C., Maryland and Virginia. Appellant also told police that he had owned a 9 millimeter handgun, which had been stolen by his niece's boyfriend before June, and a 380 handgun, which he had sold. At 6:00 p.m., Detective Fones told appellant he was charged with criminal homicide in Carlisle and read a portion of the arrest warrant to him. Appellant then asked whether "Tara is okay." The detective told appellant that she was okay and that she had identified appellant as the shooter. The appellant then dropped his head and moved it side to side. He denied any involvement in the shootings.

The police conducted a search of appellant's room in his parents' home in Fort Washington, Maryland. In the bed-

room, they found documents in a locked safe relating to a 9 millimeter Lorcin handgun. They did not find the weapon. They also found a picture of appellant holding a 9 millimeter Star handgun, as well as a Federal 44 SPL revolver with ammunition. The police also found the letter from Tara Hodge postmarked June 10, 1996. The police also searched the residence of a woman whom appellant was dating. They found some of appellant's belongings at her house, including 9 millimeter ammunition.

 In order to sustain a finding of first degree murder, the evidence must establish that a human being was unlawfully killed, the appellant did the killing, and that the killing was done in an intentional, deliberate and premeditated way. *Commonwealth v. Mitchell*, 528 Pa. 546, 599 A.2d 624 (1991). Specific intent to kill can be inferred by the use of a deadly weapon upon a vital part of the body. *Commonwealth v. Speight*, 544 Pa. 451, 460, 677 A.2d 317 (1996). We conclude upon reviewing the facts established in the case at bar, that sufficient evidence was established by the Commonwealth to support appellant's conviction.

In his brief to this court, appellant raises six claims for this court to review. Appellant's first claim is that the trial court erroneously admitted several pieces of evidence, which were seized pursuant to a search of his home. Appellant contends that the following items were not relevant to the case at hand, and therefore were inadmissible: a Bulldog Pug 44 SPL revolver, Federal 44 S & N special cartridges, a photograph of a drawer containing a bulletproof vest, the bulletproof vest, a page from appellant's scrapbook with seven photographs of guns and money and appellant posing with guns, and a second page from appellant's scrapbook with seven photographs depicting appellant with guns.

 The admissibility of evidence is a matter directed to the sound discretion of the trial court, and an appellate court may reverse only upon a showing that the trial court abused that discretion. *Commonwealth v. Wallace*, 522 Pa. 297, 561 A.2d 719 (Pa.1989). The threshold inquiry with admission of

evidence is whether the evidence is relevant. "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Spiewak,* 533 Pa. 1, 8, 617 A.2d 696, 699 (1992). In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). However, where the evidence is not relevant there is no need to determine whether the probative value of the evidence outweighs its prejudicial impact. *Id.* Instead, once it is determined that the trial court erred in admitting the evidence, the inquiry becomes whether the appellate court is convinced beyond a reasonable doubt that such error was harmless. *Id.* Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was de minimis; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. *Commonwealth v. Simmons,* 541 Pa. 211, 662 A.2d 621 (1995) *citing Commonwealth v. Williams,* 524 Pa. 404, 573 A.2d 536 (1990).

In the instant case, in order to adequately address appellant's arguments it is necessary to deal with the evidence in separate discussions.

Appellant first contends that the photographs of appellant with guns were not relevant because there was no evidence that the gun in the photographs was the gun used in the instant case. Moreover, according to appellant, the prejudicial impact of these photographs outweighed their probative value. In reply, at trial, the Commonwealth asserted that appellant would be identified posing with a 9 millimeter gun in the photographs, and indeed the gun in the photograph was identified as a 9 millimeter Star gun. (N.T., 3/12/97, 162). Thus, according to the Commonwealth the photographs were

relevant to show that appellant was capable of using and manipulating a 9 millimeter handgun, the type of gun used in the instant case. The trial court concluded that the photographs were relevant to the issue of appellant's previous experience with 9 millimeter guns and ownership of 9 millimeter guns.

The general rule is that where a weapon can not be specifically linked to a crime, such weapon is not admissible as evidence. However, there is an exception to this general rule where "the accused had a weapon or implement suitable to the commission of the crime charged. [This weapon] is always a proper ingredient of the case for the prosecution." *Commonwealth v. Lee,* 541 Pa. 260, 274, 662 A.2d 645, 652 (1995) *citing Commonwealth v. Yount,* 455 Pa. 303, 314 A.2d 242 (1974). But, this exception does not apply in the instant case. First, there was no testimony that the 9 millimeter Star gun was used to commit the instant murder. The testimony established that the 9 millimeter gun used in the murder was one of four possible makes, none of which was a Star. Moreover, the evidence presented at trial, which is not contested here, established that paperwork found in the search of appellant's room was related to a Lorcin 9 millimeter gun. Accordingly, we find it difficult to agree that the photographs depicting appellant holding a 9 millimeter Star gun, which in no way was implicated as the possible murder weapon, were relevant to the inquiry at hand.

Moreover, even if we were to accept that the photographs were relevant to show that appellant had knowledge and experience with 9 millimeter guns, it is beyond peradventure that the prejudicial impact of these photographs outweighed any probative value that the photos may have had. Prejudice to appellant becomes more clear when we examine how these photographs were used by the Commonwealth. The Commonwealth used these pictures to assert that appellant's projected lifestyle and image, as shown by his possession and pictures with guns, made him a person capable of committing the crimes in question. In the closing arguments, the prosecutor intimated that appellant's possession and use of other weap-

ons, demonstrated that appellant was capable of forming the specific intent to kill.[11] (N.T. 273). Accordingly, because the photographs were of limited, if any, probative value and were highly prejudicial, we find that they were erroneously admitted into evidence by the trial court.

However, our inquiry does not end here. Next we must determine whether such erroneously admitted evidence contributed to the verdict in the instant case. Evidence was presented at trial that established appellant's intent. Hodge testified that appellant arrived at her apartment with a gun. (N.T. 81). Testimony at trial established that appellant first shot Hodge before proceeding to the bathroom where the victim was showering. In addition, Dr. Samuel Land testified that four of the six gunshots entered vital portions of Bass' body and that any one of the four gunshots alone could have cause the victim's death. (N.T. 177–180). Moreover, there was more than ample evidence in addition to the evidence now being challenged that appellant had prior knowledge and experience with guns, including 9 millimeter guns. At trial, testimony established that: appellant was in possession of the documents related to a 9 millimeter Lorcin handgun; 9 millimeter ammunition was found during the search of appellant's girlfriend's home; and, appellant told the police at the time of his arrest that he had owned a 9 millimeter gun, which was stolen by his niece's boyfriend. In addition, testimony had established that appellant had prior experience with guns through his training in the United States Army Reserves. These photographs were merely cumulative of other substantially similar uncontested evidence admitted at trial. Accordingly, this court is convinced beyond a reasonable doubt that the erroneously admitted photographs did not contribute to the verdict in the instant case.

11. "Now there was an image projected here, and it's that big city image. You'll get to look at this. Man, I got to carry a gun wherever I go. He's not the person in here that all my life I've been treated so badly. This is the image of a kind of person capable of forming the specific intent to kill. This is a lifestyle. You look at that and you judge these acts carefully." (N.T. 273).

Appellant next contends that the Bulldog 44 SPL revolver was improperly admitted because there was no evidence that appellant had used the .44 in the commission of the instant killing. The trial court concluded that the evidence was relevant in order to support the testimony that appellant was carrying the gun in his waistband at the time of the murder. Hodge testified that appellant pulled the gun out of his "sweats" and shot her. (N.T. 81). A police officer testified that people often wrap rubber bands around the barrel of a gun to hold the gun in their waistbands. (N.T. 154). The .44 that was found during the search of appellant's home had rubber bands wrapped around the gun barrel. (N.T. 154). Thus, the Commonwealth argued and the court agreed that the .44 was relevant to show that appellant did indeed pull the gun out of his "sweats" and that appellant had knowledge and experience in the use and possession of handguns.

 In order to be relevant, evidence must tend to establish a material fact in the case. *Spiewak supra.* Although the testimony related to the .44 may be remotely relevant to the instant inquiry, it did not establish or tend to establish a material fact in the case. First, there was never any doubt that the murder weapon was a 9 millimeter gun, thus the introduction of the .44 was not relevant to the inquiry of whether the appellant had a weapon or implement suitable to commit the instant crime. In addition, Tara Hodge testified that appellant pulled a gun out of his sweats and shot her; and that the gun that appellant used was black and silver. This testimony was not disputed. We fail to see how testimony regarding where appellant had the gun on his person was of any value to the instant inquiry. Accordingly, where the testimony did not establish that rubber bands were in fact used in conjunction with the murder weapon, nor was there any testimony that would even tangentially implicate the use of a .44 in the commission of the murder, we find that the Bulldog Pug 44 SPL did not establish a material fact in the instant case and thus, was erroneously admitted into evidence at trial.

 Next we turn to the issue of whether this error was harmless. At trial, Hodge testified that the appellant was the shooter in the instant case. Testimony at trial also established that when the police first approached appellant he gave an alias to the police. Use of an alias has been recognized as evidence of a consciousness of guilt. *Commonwealth v. Collins*, 440 Pa. 368, 269 A.2d 882 (1970). In addition, Officer Bartos testified that immediately after reading the criminal homicide portion of the arrest warrant to appellant, appellant asked if "Tara is okay." (N.T. 145). In addition, the evidence admitted at trial, which is uncontested here, established that appellant had the paperwork for a 9 millimeter Lorcin gun in his possession and a Maryland State Police application to purchase a 9 millimeter firearm. Moreover, the Commonwealth made it clear that the .44 was not used in the commission of the crime.[12] (N.T. 154). Accordingly, the properly admitted evidence of guilt was so overwhelming that this court is convinced beyond a reasonable doubt that the admission of the Bulldog Pug 44 SPL did not contribute to the verdict in the instant case.

 Lastly, appellant contends that the bulletproof vest, the photo of the drawer where the bulletproof vest was found, and the .44 cartridges were inadmissible because they were not relevant to the case at hand. Clearly, these items were not relevant to the inquiry of whether appellant committed the crime in question, where there was absolutely nothing in the case that even remotely connected the bulletproof vest to any of the issues in the case. As the trial court noted in its post-trial opinion, "we do not believe that the admission of the bulletproof vest and the picture of it in defendant's drawer logically tended to establish a material fact in the case." We believe that this logic also extends to the .44 cartridges. Thus, as the trial court acknowledged, it erroneously admitted these items into evidence.

12. During direct examination of Detective Fones, with regard to the 44, the Commonwealth asked the following question:
> Q: And not to confuse anyone, this is not the weapon that was used in this killing?
> A: No, it is not.

■ Next, we must determine whether this error was harmless, and as such did not contribute to the verdict. As stated in the previous section, it appears that this case clearly presents a situation where the evidence of guilt is so overwhelming that the error in admitting the above evidence did not contribute to the verdict in the instant case. Accordingly, the error was harmless.

■ Appellant's second claim is that the court erred in not allowing his mother to testify as to why appellant had guns in the house. The trial court held that the reason why appellant had the guns in the house was not relevant to the inquiry of whether he used a gun on Bass and Hodge. Although normally we would agree with the trial court's assessment, we are troubled by the fact that the Commonwealth implied that the reason that appellant possessed guns was so he would feel like a "big city man." (N.T. 273). Moreover, the Commonwealth stated in its closing arguments that appellant's possession of guns showed that he had the capability to form the specific intent to kill. (N.T. 273). The testimony of Mrs. Robinson was relevant to refute the Commonwealth's contention that appellant possessed guns merely to be a "big city man." Mrs. Robinson's testimony would have offered a different explanation of why appellant had guns in the home—to protect the household, which included two nieces under the age of fifteen.

■ Although we believe that the trial court erred in refusing to allow Mrs. Robinson to testify, based on the above harmless error analysis, the instant case presents the situation where there the properly admitted evidence of guilt was overwhelming. Accordingly, this error was harmless.

■ Appellant's third claim is that the trial court erred in refusing to give a jury instruction on voluntary manslaughter. A defendant is entitled to a voluntary manslaughter charge only when the evidence adduced at trial would support such a charge. *Commonwealth v. Browdie*, 543 Pa. 337, 349, 671 A.2d 668, 674 (1996); *Commonwealth v. Williams*, 537 Pa. 1, 640 A.2d 1251 (1994). In determining whether the evidence adduced at trial supported such a charge we must view the

evidence in the light most favorable to defendant. Voluntary manslaughter, 18 Pa.C.S. § 2503(a) is defined as follows:

(a) General Rule—A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

In *Commonwealth v. Jones*, 546 Pa. 161, 683 A.2d 1181 (1996), this court held that a voluntary manslaughter charge is not proper where the person who was killed is not the person who provoked the defendant, absent evidence of negligence or accident.

In his brief to this court, appellant's evidence of provocation relates to past incidents with Tara Hodge and appellant's interaction with Tara Hodge on the night of the murder. Accordingly, it appears that appellant is arguing that Tara Hodge was responsible for the provocation that warranted the voluntary manslaughter charge. However, Tara Hodge was not the individual killed. Moreover, appellant does not assert that he was endeavoring to kill Tara Hodge at the time he shot Rashawn Bass, or that he negligently or accidentally shot Bass. Appellant seems to imply that a voluntary manslaughter charge is warranted even where he was provoked by someone other than the person who was murdered. There is no legal support for such argument. Accordingly, appellant's claim lacks arguable merit.

Appellant's fourth claim is that the trial court erred in failing to include any life qualification questions during voir dire of potential jurors.[13] "[T]he scope of voir dire

13. "Life qualification occurs where counsel identifies and excludes those jurors who have a fixed opinion that a sentence of life imprisonment should not be imposed for a conviction of first degree murder." *Commonwealth v. Cox*, 546 Pa. 515, 686 A.2d 1279, 1290 (1996); see

rests in the sound discretion of the trial judge and his or her decisions will not be reversed unless palpable error is established." *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996). During voir dire the judge asked the following question of potential jurors:

> If the jury finds the defendant guilty of murder in the first degree, would you after hearing all additional evidence automatically vote to impose the death penalty or would you vote to impose life imprisonment, if you found that life imprisonment was the appropriate penalty based on the facts and the law charged by the Court.

Essentially, appellant appears to be arguing that the life qualification question should have been given exactly the way that it was phrased in the defense proposed questions. There is no error reflected by the trial judge giving the life qualification question in the manner described. Accordingly, this argument is without merit.

 Appellant's fifth claim is that the trial court failed to rehabilitate certain jurors after it was established that they would not vote to impose the death penalty.[14] Specifically, appellant relies on the court's failure to rehabilitate juror # 6. During voir dire, juror # 6 responded "I don't know" when asked if she could vote to impose the death penalty in the instant case. Following this, the court then asked the following question:

> If defendant is convicted of murder in the first degree, is any opposition or concern you have to the death penalty so firm and fixed that you could not after hearing all additional evidence set aside your own beliefs or scruples in deference

also *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

14. Appellee argues that this issue was not raised in appellant's post-trial motions to the trial court and was therefore waived, pursuant to Pa.R.A.P. 302(a). In capital cases, this court can relax the waiver rule, Rule 302(a), and address an issue raised to this court for the first time in an appellant's direct appeal "because of the final and irrevocable nature of the death penalty." *Commonwealth v. Morris*, 546 Pa. 296, 684 A.2d 1037, 1042 n. 11 (Pa.1996) *citing Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982) *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).

to the law and if the facts and the law support the imposition of the Defendant (sic) penalty vote for the death penalty in this case? Could you do that?

(N.T. 23). The juror again responded that she didn't know. The Commonwealth challenged this juror for cause, and the court granted the challenge without attempting to rehabilitate this juror.

 The decision to strike for cause is within the sound discretion of the trial judge, and absent an abuse of discretion the court's decision will stand. *Commonwealth v. Fisher*, 545 Pa. 233, 681 A.2d 130 (1996). "This Court has repeatedly stated that the purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions on the law as provided by the trial court." *Commonwealth v. Paolello*, 542 Pa. 47, 665 A.2d 439, 450 (Pa.1995). In the instant case, based on the above exchange it is unclear whether this juror would have been able to follow the instructions on the law. Moreover, the trial court does not have a duty to rehabilitate a potential juror where it is not clear that the potential juror would be able to follow the instructions on the law. *Paolello* at 450, 451. Accordingly, we do not find that the trial court abused its discretion in striking this juror for cause.

 Appellant's sixth and final claim is that the trial court should have given a jury instruction that life sentence means life without the possibility of parole.[15] "[A] jury must be informed that life means life without the possibility of parole only when the prosecutor injects concerns of the defendant's future dangerousness into the case." *Commonwealth v. May*, 551 Pa. 286, 710 A.2d 44 (Pa. 1998). In *May*, this court rejected a claim that by raising the aggravating circumstance of a significant history of felony convictions, the Commonwealth "injected the issue of his future dangerousness into the sentencing hearing." *Id.*

15. This type of instruction is commonly referred to as a Simmons instruction, arising out of the case *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994).

 Appellant contends that the Commonwealth spent "a good deal of time in both their case-in-chief and the penalty phase" implicating the future dangerousness of appellant by references to the fact that appellant was dangerous before the murder. In *May*, this court rejected a similar argument. Moreover, this court has embraced the notion that this type of instruction is necessary only where the future dangerousness of defendant is expressly implicated.[16] Thus, where the only references to the dangerousness of appellant relate to appellant's past dangerousness a Simmons instruction is not necessary. Accordingly, appellant's argument is without merit.

 Finally, in accordance with our statutory duty, 42 Pa.C.S. §9711(h)(3), this court must affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Upon our review of the record it is clear that the sentence imposed was not a product of passion, prejudice or any other arbitrary factor. We further find that the evidence was sufficient to establish the aggravating factors found by the jury. The jury found two aggravating factors and two mitigating factors. The aggravating factors that the jury found were that the appellant knowingly created a grave risk of harm to another, 42 Pa.C.S. §9711(d)(7), and that the appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S. §9711(d)(6). The mitigating factors that the jury

16. In addition to *Commonwealth v. May*, in *Commonwealth v. Simmons* this court noted that a "Simmons" instruction would not be necessary where the prosecutor implied in his closing statement that life imprisonment does not mean life imprisonment, since such a statement did not implicate defendant's future dangerousness. 541 Pa. 211, 250 n. 15, 662 A.2d 621, 640 n. 15 (1995).

found were the youth of appellant, 42 Pa.C.S. §9711(e)(4), and appellant's future contributions to society, 42 Pa.C.S. §9711(e)(8).[17] In addition, after reviewing the information compiled by our Administrative Office, the circumstances of the crime, and the character and record of appellant, in accordance with the requirements set forth in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (Pa.1984), *cert. denied*, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), we do not find the sentence imposed upon this appellant to be disproportionate to the sentence imposed upon defendants in similar cases.[18] Accordingly, we affirm the verdict and sentence of death imposed upon appellant, Antyane Robinson, by the Court of Common Pleas of Cumberland County.[19]

Justices ZAPPALA, NIGRO and NEWMAN file concurring opinions.

Chief Justice FLAHERTY files a dissenting opinion.

ZAPPALA, Justice, concurring.

I agree with Mr. Chief Justice Flaherty that a jury instruction regarding the meaning of "life imprisonment" under the law of the Commonwealth would be appropriate in all capital cases. However, I believe such an instruction should be standardized[1] and should be implemented prospectively.

**17.** Although the verdict slip reflects that only one mitigating circumstance was submitted to the jury, evidence of appellant's good character, the jury found two mitigating circumstances.

**18.** Subsection (h)(3)(iii) of 42 Pa.C.S. §9711 has been amended to delete the requirement for a proportionality review effective June 25, 1997. However, as the appellant herein was convicted and sentenced prior to the amendment, a proportionality review is mandated. *Commonwealth v. Gribble*, 550 Pa. 62, 703 A.2d 426 (Pa.1997).

**19.** The Prothonotary of the Supreme Court is directed to transmit the full and complete record of this case to the Governor forthwith. 42 Pa.C.S. §9711(i).

**1.** In my view, such an instruction should advise the jury that a person subject to a term of life imprisonment is not eligible for parole; the Governor has the power to grant commutation of sentence or pardon upon unanimous recommendation of the Board of Pardons following a public hearing; and the Board of Pardons is composed of the Lieutenant Governor, the Attorney General, and three Pennsylvania residents

Thus I join the majority opinion because it follows our precedents, which hold that such an instruction is required only where the future dangerousness of the defendant has been expressly implicated. Since the common pleas court did not err in not giving the instruction, and the mere absence of such an instruction does not warrant a finding that the sentence was "the product of passion, prejudice, or any other arbitrary factor," there is no cause to remand for a new sentencing proceeding as called for by the dissenting opinion.

NIGRO, Justice, concurring.

I join in Mr. Justice Zappala's concurring opinion for the reasons more fully explained in my concurring opinion in *Commonwealth v. Clark,* 551 Pa. 258, 710 A.2d 31, 43–44 (Pa.1998) (Nigro, J., concurring). As I noted in *Clark,* I believe that a standard *Simmons* instruction should be given in all capital cases and should also include, in addition to the information recommended by Justice Zappala in footnote one of his concurring opinion, statistical information relating to the percentage of life sentences which have been commuted within the last several years.

NEWMAN, Justice, concurring.

I join the majority, and write separately only to reiterate the position I expressed in *Commonwealth v. Chandler,* —— Pa. ——, 721 A.2d 1040, (1998) regarding the "life means life" issue. As I stated in *Chandler:*

> [I]n cases where *Simmons* would require a "life means life" instruction, I agree with Chief Justice Flaherty that the court should instruct the jury that the defendant's sentence could be commuted. Where future dangerousness is at issue, the impossibility of parole and the possibility of commutation are equally relevant, so the court should inform the jury of both contingencies.

appointed by the Governor, including a crime victim, a corrections expert, and a medical doctor, psychiatrist or psychologist.

In this case, I agree with the majority that future dangerousness was not at issue. Accordingly, I agree that the trial court properly declined to give a "life means life" instruction.

FLAHERTY, Chief Justice, dissenting.

Although the majority opinion correctly states the law pertaining to *Simmons* instructions, I dissent. There can be no harm in instructing juries that in Pennsylvania appellant would be statutorily ineligible for parole if sentenced to life in prison, but that a life sentence may nonetheless be commuted by the governor. Without such an instruction, on the other hand, a jury might erroneously believe that a prisoner sentenced to life could be paroled within a period of years and therefore impose the death penalty for reasons which are not based in law. I would mandate a *Simmons* instruction, explaining what a life sentence means in Pennsylvania, in every death penalty case. Therefore, I would vacate the sentence of death and remand for a new sentencing hearing.