J-S51017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JAMIR EDMONDS | |
| Appellant | No. 2294 EDA 2014 |

Appeal from the Judgment of Sentence July 10, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001936-2013

BEFORE:  GANTMAN, P.J., LAZARUS, J., and PLATT, J.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED OCTOBER 30, 2015**

Jamir Edmonds appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County after he was convicted of first-degree murder.[1]  Upon careful review, we affirm.

The trial court summarized the relevant facts of this matter as follows:

On May 1, 2014, a jury found [Edmonds] guilty of the first degree murder of Edward Taylor.  The facts admitted at trial established that Edward Taylor was shot and killed [by Edmonds] on January 14, 2013 in the city of Chester, Pennsylvania. . . . The suggested motive was to obtain a bounty that had been placed upon Taylor's head in retaliation for a shooting purportedly involving Taylor.  On January 14, 2013, the Chester Police responded to the 900 block of West 8th Street and found Taylor on the ground.  He was unresponsive.  Fifteen (15)

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

shell casings were located at the scene, and ballistics testing revealed that the casings came from one firearm.

Several witnesses were in the area at the time of the shooting and testified at trial. Karen Harden testified that on the day of the shooting she lived at 922 West 8th Street and was at home at the time. She testified that prior to the shooting [Edmonds] knocked on her door and asked if "Mitch lived there." Harden testified that she told [Edmonds] that Mitch lived two doors down, and she observed [Edmonds] walk away in the opposite direction that she had directed him to. Harden was familiar with [Edmonds] and knew him because her daughter is friends with the mother of [Edmonds'] child. According to Harden, [Edmonds] was wearing a gray hoody and a black bubble vest that day. Shortly after speaking to [Edmonds], Harden heard gunshots outside. She did not observe the shooting, but after she heard shots she ran upstairs to her bedroom and looked out the window. She observed some individuals across the street and then she ran from her house to the car where the shots had been fired. By the time Harden reached the area several people had gathered, and two individuals removed the victim from the car.

Steven Harris, another eyewitness, testified that he was on the 800 block of 8th Street at approximately 2:00 P.M. on January 14, 2013. On that date and time Harris observed one person fire shots into the passenger side of a green Buick on 8th Street. According to Harris, the shooter was wearing a dark colored vest and after the shooting the individual went south on Lincoln Street, taking a right off of 8th Street. Harris was unable to see the shooter's face because he was wearing a hood.

Detective David Tyler, of the Criminal Investigation Division of the Delaware District Attorney's Office, testified that he spoke to [Edmonds] on January 31, 2013. [Edmonds] provided a statement and admitted to being in the area on January 14, 2013. He stated that he was visiting his "baby momma" Tasha Martin. According to [Edmonds], he was walking down Tillman and 7th Streets in Chester when he heard about 20 gunshots. He told Detective Tyler that after the shooting, his aunt drove him to 5th and Parker Streets. He told Detective Tyler that he heard that the "8th Street Boys" had accused him of killing Taylor. [Edmonds] also stated that he had heard that Taylor "had money on his head." [Edmonds] explained to Detective Tyler that "they said [Taylor] shot somebody and they said he had

$15,000.  I don't know nothing about $15,000."  [Edmonds] told Detective Tyler that he was wearing a gray and black hoody, with grey sleeves and a black chest on January 14, 2013.

Shannon Scouten, [Edmonds'] aunt, also testified at trial.  She testified that on January 14, 2013[,] she was working in the area of 7th and Lincoln Streets in Chester.  Scouten, a bus driver, denied picking up [Edmonds] on that day.  She testified that [Edmonds] had called her that day around 1 P.M. and asked her to pick him up, but she explained that she was working and couldn't.

At trial the Commonwealth produced a recording of a telephone call that [Edmonds] had made to his girlfriend from the Delaware County Prison Intake Unit where he stated "[w]hen you get them numbers tell F and them that I need a check ASAP."  Detective Tyler testified at trial that he was familiar with "F" and "Apple[s]" and identified them as Farad Ishmael and Rashad Ishmael, respectively.

Following a three day trial, a jury found [Edmonds] guilty of first degree murder.  On July 10, 2014, this court sentenced [Edmonds] to a mandatory sentence of life in prison.

Trial Court Opinion, 3/26/15, at 1-3 (citations omitted).

This timely appeal followed.  On appeal, Edmonds raises the following issues, which we have renumbered for ease of disposition:

1. Was the trial court in error for denying [Edmonds'] motion prior to the commencement of jury selection as to a general **Batson**[2] objection in that of seventy[-]five (75) prospective jurors [called for] jury selection, one of those was African-American?

2. Was the trial court in error for denying a specific **Batson** challenge as to juror No. 39 after being struck by the Commonwealth of Pennsylvania in that said juror was the only African-American juror of the entire jury panel?

---

[2] **Batson v. Kentucky**, 476 U.S. 79 (1986).

- 3 -

3. Was the trial court in error for denying [Edmonds'] motion to exclude from the Commonwealth's case a telephone call made by [Edmonds] while being housed at the Delaware County prison?

4. Was the trial court in error for granting Commonwealth's motion for sequestration of two individuals[,] Farad Ishmael and Rashad Ishmael?

Brief for Appellant, at 4.

In his first issue, Edmonds asserts that the jury panel did not reflect a fair cross-section of the community.

> In order to establish a prima facie violation of the requirement that the jury array fairly represent the community, a defendant must show that: (1) the group allegedly excluded is a distinctive group in the community; (2) the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such people in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury selection process. **Duren v. Missouri**, 439 U.S. 357, 364 (1979). "Systematic" means caused by or inherent in the system by which juries [are] selected. **Id.** at 366-67.

**Commonwealth v. Craver**, 688 A.2d 691, 696 (Pa. 1997).

Edmonds fails to make a prima facie showing pursuant to **Craver**. Assuming that Edmonds meets the first two prongs, that African Americans are a distinctive group in Delaware County and that a single African American in the jury panel does not represent the number of such individuals in the community, Edmonds nevertheless fails to meet the third prong. Indeed, Edmonds fails to make any argument that the underrepresentation of African Americans in the jury pool was due to any sort of systematic exclusion of such individuals.

- 4 -

At a pre-trial hearing conducted to address the issue, Nancy Alkins of the Delaware County Court Administrator's Office testified to the procedure that is used to create a jury panel. The jury selection process is entirely random and does not indicate the race of prospective jurors. The sources from which prospective jurors are selected include voter registration lists, driver's license lists, tax rolls, and welfare rolls. This procedure does not systematically produce jury panels in which African Americans are underrepresented. *See Commonwealth v. Smith*, 694 A.2d 1086, 1095 (Pa. 1997) (selection process including use of voter registration lists and lists of licensed drivers found to be fair and constitutional in *Craver*). Thus, Edmonds is due no relief regarding his claim that the jury panel did not fairly represent the community.

Next, Edmonds makes a *Batson* claim that juror No. 39, the only African American on the panel, was improperly struck.

> To show a *Batson* violation, an appellant must generally demonstrate his particular factual situation satisfies the well established test laid out by the United States Supreme Court's opinion in that case: First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for his peremptory challenges. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 96–98.

*Commonwealth v. Simpson*, 66 A.3d 253, 261 (Pa. 2013).

Here, prospective juror No. 39 was struck for cause because he answered yes to the question of whether he could not or should not serve on a jury. He indicated that he "[does not] understand a lot of things." N.T. Trial, 4/29/14, at 143. He also stated that his girlfriend helped him complete his juror questionnaire because he did not understand "a lot of things and words." *Id.* at 144. Thus, the Commonwealth did not use a peremptory challenge,[3] and this case does not involve a **Batson** issue. **Simpson**, **supra**. Moreover, the decision to strike a prospective juror for cause is within the discretion of the trial judge, and it is not an abuse of discretion to strike a juror for cause "where it is not clear that the potential juror would be able to follow the instructions on the law." **Commonwealth v. Robinson**, 721 A.2d 344, 354 (Pa. 1998) (citation omitted). Accordingly, Edmonds' **Batson** challenge is meritless.

In his next issue, Edmonds asserts that the trial court erred in permitting the Commonwealth to admit into evidence the recorded telephone call referencing "F and them" that he made while he was housed at the Delaware County Prison.

_____

[3] Edmonds notes that the Commonwealth did not initially make a motion to strike, but then decided to make a motion after the trial judge stated that "there might be reason for cause." N.T. Trial, 4/29/14, at 101. However, even if striking juror No. 39 were considered to be a peremptory strike, Edmonds' **Batson** claim lacks merit. Juror No. 39 was struck for a race-neutral reason which the trial court found to be compelling, and nothing in the record demonstrates purposeful discrimination on the part of the Commonwealth. **Simpson**, **supra**.

In reviewing evidentiary rulings, our standard of review is well-settled:

A trial court's decision to allow the admission of evidence is a matter within its sound discretion, and we will reverse that decision only when it has been shown that the trial court abused that discretion.

*Commonwealth v. Briggs*, 12 A.3d 291, 336 (Pa. 2011). Regarding whether evidence is admissible, the threshold inquiry

is whether the evidence is relevant. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact. In addition, evidence is only admissible where the probative value of the evidence outweighs its prejudicial impact.

*Commonwealth v. Antidormi*, 84 A.3d 736, 750 (Pa. Super. 2014) (citations omitted).

Instantly, the recorded telephone conversation was introduced by the Commonwealth as evidence of Edmonds' motive to murder Taylor. Edmonds argues that the evidence is speculative such that its prejudicial value outweighs its relevance. However, the conversation clearly demonstrates Edmonds' wish to be paid by the Ishmael brothers, Farad and Rashad Ishmael, who were identified by Detective Tyler and who allegedly placed the bounty on Taylor's head. The alleged price on Taylor's head and Edmonds' attempt to be paid indicate motive, and we note that evidence of motive is always relevant and admissible. *Commonwealth v. Ward*, 605 A.2d 796, 797 (Pa. 1992). Thus, the trial court did not err in permitting the Commonwealth to introduce the recorded telephone conversation. *Briggs*, *supra*.

Finally, Edmonds claims that the trial court abused its discretion in granting the Commonwealth's motion to sequester Farad and Rashad Ishmael. "We will not reverse a trial judge's decision to grant or deny sequestration absent a clear abuse of discretion. Moreover, an appellant must demonstrate that he or she was actually prejudiced by a trial judge's sequestration order before any relief may be warranted." **Commonwealth v. Stevenson**, 894 A.2d 759, 767 (Pa. Super. 2006) (citations omitted).

Here, the Commonwealth made a motion to sequester[4] the Ishmael brothers because they were mentioned in the phone call Edmonds made and were suspected of being involved in the bounty allegedly placed on Edward Taylor's head. Edmonds argues that Farad and Rashad were not going to be called as witnesses because the Commonwealth did not include them in its

---

[4] Sequestration is governed by Pennsylvania Rule of Evidence 615:

At a party's request the court may order witnesses sequestered so that they cannot learn of other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize sequestering:

    (a)    a party who is a natural person;

    (b)    an officer or employee of a party that is not a natural person (including the Commonwealth) after being designated as the party's representative by its attorney;

    (c)    a person whose presence a party shows to be essential to presenting the party's claim or defense; or

    (d)    a person authorized by statute or rule to be present.

Pa.R.E. 615.

witness list and the telephone call did not include their names. However, Detective Tyler's testimony established that the telephone call referred to them. Thus, it was reasonable to believe that either or both brothers could be called to testify, and sequestering them served the purpose set forth in Pa.R.E. 615 by preventing them from learning of other witnesses' testimony. Furthermore, Edmonds makes no argument that he was prejudiced in any manner by the sequestration. **Stevenson**, **supra**. Thus, we discern no abuse of discretion on the part of the trial court in granting the order to sequester Farad and Rashad Ishmael.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/30/2015