J-A31002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| GABRIEL RODRIGUEZ-DIAZ, | |
| Appellant | No. 1347 EDA 2015 |

Appeal from the Judgment of Sentence Entered April 2, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s):
CP-51-CR-0005087-2012
CP-51-CR-0005088-2012

BEFORE:  BENDER, P.J.E., MOULTON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED DECEMBER 28, 2016**

Appellant, Gabriel Rodriguez-Diaz, appeals from the judgment of sentence of an aggregate term of 16 to 36 years' incarceration, followed by 5 years' probation, imposed after a jury convicted him of conspiracy to commit murder and related offenses.  After careful review, we affirm.

The trial court summarized the facts of this case as follows:

> On September 3, 2011, Philadelphia Police Officer Howard Lee was sitting inside his patrol car outside 4210 Whitaker Avenue when he heard gunfire coining from the rear of a night club [sic] called the Casa De España that was situated at that location.  The officer exited his vehicle and ran to the rear of the club.  While doing so, he heard more gun shots [sic] and encountered numerous people running from the rear parking lot

_____

[*] Former Justice specially assigned to the Superior Court.

while screaming that the gun fire [*sic*] was coming from the rear of the club.

Once in the rear of the club, Officer Lee spoke to a male named Jose Pagan and saw numerous other persons running away from the club. Based on information received from Mr. Pagan, Officer Lee proceeded to a driveway leading onto Hunting Park Avenue and observed a dark colored vehicle exiting the driveway onto westbound Hunting Park Avenue at a high rate of speed. Officer Lee notified police radio of the description of the car and its direction of travel.

After the vehicle sped away, Officer Lee returned to the rear of the club to secure the crime scene. Upon his return, he observed Edwin Santana, with blood visible on his clothing covering his abdomen, outside the club. Officer Lee later gave a statement to police detectives detailing his activities that evening.

Police Officer Anthony Sampson was driving his patrol car eastbound on Whitaker Avenue at or about the time of the incident when he received a radio call informing him that shots had been fired at Whitaker and Hunting Park Avenues. He immediately proceeded to that location and[,] as he was arriving, he heard people screaming that there had been a shooting and three persons had been shot. Officer Sampson also observed a car traveling west on Hunting Park Avenue at a high rate of speed. The Officer made a u-turn after hearing several by-standers yell, "That's the car. That's the black car - an Acura." Police Officer Sampson pursued the vehicle along with several other officers all of whom were attempting to stop the car. At one point, the driver of the car being pursued stopped briefly at Front and Luzerne Streets but then sped away when Officer Sampson stepped out of his vehicle. Police finally stopped the vehicle when it crashed into a pole during the pursuit in the 4000 block of Front Street after a ten block high speed chase.

The [v]ictim, Mr. Santana, suffered multiple gunshot wounds during the incident. He was taken to a nearby hospital for treatment. While there he gave a signed statement to Philadelphia Police Detective James Perfidio wherein he related that he had an altercation inside the Casa De España nightclub. The fight spilled outside where he was approached by two individuals, one of whom shot him. In his statement, Santana

- 2 -

gave a description of the two males, the guns they used, and said that they fled in a black vehicle he believed was a Honda down Whitaker Avenue to Hunting Park Avenue.[2]

> [2] Santana completely disavowed having given the statement stating that he was high when he was shot and when he was interviewed by police. Detective Perfido [*sic*] testified that Santana was awake and alert, did not appear to be under the influence, and that he signed his statement. He added that he recorded Santana's responses verbatim. Santana described his assailants as follows: One was a short Hispanic male with long braids wearing a blue shirt. The second guy was 5' 11", Hispanic male, with short braids and a turquoise shirt.[]

Mr. Pagan was present when the shooting occurred. He related that he was inside the club with an acquaintance named Chio,[1] who got into a fight with a male after the male and Chio's girlfriend became involved in a dispute. After the fight, Pagan told Chio to leave because the person Chio fought with had been escorted from the [c]lub and he did not know who he was. Pagan and Chio then left the club to smoke a cigarette. When they got outside, two men approached from behind the building armed with handguns.

When []Chio[] saw the two men, he told one of them to put his gun down and fight him "like a man." The men did not put down the guns but instead began firing at Chio. When they stopped shooting, the two males walked behind the building after which Pagan saw a dark sporty Honda speed out of the lot.

Shortly after the shooting, police transported Pagan to the location where the fleeing vehicle had crashed. Once there, Pagan identified the vehicle as the one he saw drive from the lot and told police that the two males police had in custody were the males he saw shoot Chio. Pagan also gave police a statement describing the person who shot Chio as having on a teal shirt with his hair in braids. Pagan, however, could not identify where each [individual] was seated in the vehicle because they were already outside when he was brought to the location to identify them.

---

[1] It is undisputed that Chio is a nickname for Edwin Santana.

- 3 -

Police Sergeant David Pinkerton participated in the pursuit of the [vehicle], and prevented it from leaving after it became disabled. Sgt. Pinkerton approached the vehicle and observed its driver, later identified as [Appellant], who had braids and was wearing a teal greenish colored shirt, climbing from the driver's seat into the rear seat. [Sgt.] Pinkerton immediately placed [Appellant] in custody as other officers apprehended the front seat passenger, … Jonathon [sic] Ayala, who also was wearing a teal greenish colored shirt. The sergeant then secured the vehicle for later examination. As he did so he observed a black automatic handgun behind the driver's seat. The gun was secured and found empty of ammunition.

[Sgt.] Pinkerton was present when Mr. Pagan arrived at the scene to identify [Appellant and Ayala]. Although the [s]ergeant could not hear what Pagan said[,] he observed him shaking his head "yes" while pointing to [Appellant] and [Ayala], and the vehicle. After Pagan identified [Appellant and Ayala], [Sgt.] Pinkerton retraced the route of the pursuit. While doing so, he recovered a Glock hand gun [sic] in the general area where the … vehicle struck a utility pole as it fled police. He conceded that during the pursuit, he did not see the gun thrown from the vehicle.

Police obtained a search warrant for [the] vehicle. Upon executing the warrant, they seized the handgun, a .45 caliber Colt MK4, from the backseat. They also collected the Glock received by [Sgt.] Pinkerton on the highway as well as ten .45 caliber fired cartridge cases and a projectile in the rear parking lot of the club. Police observed bullet holes in the door of the club and recovered a bullet fragment inside the club.

The ballistic evidence was later examined by Police Firearms Examiner Ann Marie Barnes. Her examination revealed that the ten fired cartridge cases and the spent projectile had been fired from the Colt .45 hand gun [sic] recovered from the rear of the … vehicle.

Trial Court Opinion (TCO), 1/21/16, at 2-6 (citations to the record and one footnote omitted).

In January of 2015, Appellant and Ayala were tried together before a jury, and both men were convicted of various offenses. Specifically,

Appellant was convicted of conspiracy to commit murder, 18 Pa.C.S. §§ 903 and 2502; possessing an instrument of crime, 18 Pa.C.S. § 907; possession of a firearm by a person prohibited, 18 Pa.C.S. § 6105; carrying a firearm without a license, 18 Pa.C.S. § 6106; carrying a firearm on a public street in Philadelphia, 18 Pa.C.S. § 6108; and recklessly endangering another person, 18 Pa.C.S. § 2705.[2]   On April 2, 2015, Appellant was sentenced to an aggregate term of 16 to 36 years' imprisonment, followed by 5 years' probation.  He filed a timely notice of appeal, and also timely complied with the trial court's order to file a Pa.R.A.P. 1925(b) statement.  The court filed a Rule 1925(a) opinion on January 21, 2016.

Herein, Appellant presents three issues for our review:

I. Did the trial court err in admitting the complainant's prior statement to Detective Perdifio [*sic*] as substantive evidence of Appellant's guilt where the statement failed to satisfy the prerequisites for admissibility under Pennsylvania Rule of Evidence 803.1(1)?

II. Did the [trial] court err in refusing to strike [Sgt.] Pinkerton's testimony that a witness had identified Appellant as one of the shooters where [Sgt.] Pinkerton was not present for the identification and his testimony thus constituted inadmissible double-hearsay?

_____

[2] Ayala was convicted of attempted murder, 18 Pa.C.S. § 2502; conspiracy to commit murder, 18 Pa.C.S. §§ 903 and 2502; aggravated assault, 18 Pa.C.S. § 2702; possessing an instrument of crime, 18 Pa.C.S. § 907; possession of a firearm by a person prohibited, 18 Pa.C.S. § 6105; carrying a firearm without a license, 18 Pa.C.S. § 6106; carrying a firearm on a public street in Philadelphia, 18 Pa.C.S. § 6108; and recklessly endangering another person, 18 Pa.C.S. § 2705.  He was sentenced to an aggregate term of 30 to 60 years' imprisonment, followed by 15 years' probation.

III. Were Appellant's convictions against the clear weight of the evidence where the testimony of eyewitness Jose Pagan and Police Officer Howard Lee contradicted that of [Sgt.] Pinkerton regarding whether [] Pagan had identified Appellant as the shooter?

Appellant's Brief at 11 (unnecessary capitalization and emphasis omitted).

In Appellant's first issue, he challenges the court's admission of certain evidence.

The standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

*Commonwealth v. Young*, 989 A.2d 920, 924 (Pa. Super. 2010) (internal citations omitted).

In this case, Appellant takes issue with the court's admission of an out-of-court statement made by the victim, Edwin Santana, to Detective Perfidio, and entered into evidence as a prior inconsistent statement under Pa.R.E. 803.1(1). That rule states:

The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:

**(1) Prior Inconsistent Statement of Declarant-Witness.** A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:

(A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;

> (B) is a writing signed and adopted by the declarant; or
>
> (C) is a verbatim contemporaneous electronic, audiotaped, or videotaped recording of an oral statement.

Pa.R.E. 803.1(1).

Appellant claims that Santana's statement to Detective Perfidio did not satisfy any of the subparts of Rule 803.1(1) and, thus, it was inadmissible. More specifically, he maintains that the Commonwealth failed to prove that Santana's signed statement was adopted by Santana. Appellant stresses that when Santana provided his statement, he "was intoxicated, had been given morphine, and was awaiting surgery for multiple gunshot wounds." Appellant's Brief at 14 (citation to the record omitted). Appellant contends that, "[g]iven [Santana's] physical condition, it is highly unlikely that [] Santana reviewed and affirmatively adopted the contents of the interview." *Id.*

Appellant's arguments are unconvincing. At trial, Detective Perfidio testified that when he interviewed Santana in the hospital, Santana was awake, alert, and did not appear to be intoxicated. N.T. Trial, 1/22/15, at 90. The detective stated that he handwrote exactly what Santana told him, and at the end of the statement, the detective watched as Santana read it to make sure that "everything [was] true and correct…." *Id.* at 92, 93. After Santana reviewed the statement and confirmed that he had no corrections, he signed it in the detective's presence. *Id.* at 93-94. Additionally, even if Santana's condition at the hospital impacted his ability to adopt the statement at that time, the Commonwealth presented evidence that Santana

adopted his statement shortly before Appellant's trial. Namely, Officer Eric Pross testified that approximately one week before Appellant's trial, the officer observed the prosecutor show Santana a copy of the statement. *Id.* at 237-28. Officer Pross watched Santana review that statement, after which the prosecutor asked Santana "if he had any changes or corrections to make to that statement[.]" *Id.* at 238-39. The officer testified that Santana did not make any changes or corrections. *Id.* at 239. Viewing this evidence as a whole, we conclude that the Commonwealth sufficiently demonstrated that Santana signed and adopted his statement to Detective Perfidio. Thus, the trial court did not abuse its discretion in admitting Santana's prior inconsistent statement under Rule 803.1(1)(B).

Next, Appellant takes issue with the court's decision to deny his motion to strike certain testimony by Sgt. Pinkerton. As context for Appellant's claim, he cites Sgt. Pinkerton's direct-examination testimony regarding Jose Pagan's identification of Appellant and Ayala at the scene of their vehicle crash:

> [The Commonwealth:] When [Pagan] gets to that location, what is he brought there for?
>
> [Sgt. Pinkerton:] For identification.
>
> …
>
> [The Commonwealth:] … [Pagan] is brought there and first he is there to look at the vehicle? Is that fair?
>
> [Sgt. Pinkerton:] Yes.
>
> [The Commonwealth:] Does he identify that vehicle.

[Sgt. Pinkerton:] Yes.

[The Commonwealth:] The two individuals that you said were already in handcuffs.

…

Does he identify any of those individuals?

[Sgt. Pinkerton:] Yes. Both males, one at a time, are taken out of the vehicle. The witness has a chance to identify. **Identified both individuals as the males from the shooting up on Whitaker Avenue.**

N.T. Trial, 1/22/15, at 192-93 (emphasis added).

On cross-examination, defense counsel questioned Sgt. Pinkerton further about Pagan's identification of Appellant and Ayala:

[Defense Counsel:] And with regard to Mr. Pagan, you were at the scene and he did not identify Mr. Ayala as doing anything at the [nightclub]; correct?

[Sgt. Pinkerton:] The only thing I got that was at the scene [was] he said -- he pointed to both of them, shook his head yes. I didn't have a conversation [with Pagan]. The officer that had both -- had [Pagan] in the car had the conversation with him.

…

[Defense Counsel:] So wait a minute. At no time does the witness identify to you what person A, the passenger, and person B did?

[Sgt. Pinkerton:] No.

*Id.* at 208-09. Upon further questioning by defense counsel, Sgt. Pinkerton acknowledged that he did not hear or see Pagan identify Appellant and/or Ayala; rather, Pagan's identification had been "relayed" to him by another officer. *Id.* at 209-211.

After Sgt. Pinkerton's testimony concluded, both Appellant's and Ayala's attorneys moved to strike Sgt. Pinkerton's testimony regarding Pagan's identification of Appellant and Ayala. *Id.* at 223. A lengthy and confusing discussion regarding that motion ensued, during which both defense attorneys seemingly argued that Sgt. Pinkerton's *direct-examination* testimony regarding Pagan's identification should be stricken. In other words, the defense sought to strike the sergeant's statement that Pagan "[i]dentified both individuals as the males from the shooting up on Whitaker Avenue." *Id.* at 193. The defense argued that this testimony constituted "secondhand hearsay," *id.* at 227, as Sgt. Pinkerton had admitted on cross-examination that he did not actually hear or see Pagan make that identification, but had only been told about it by another officer. The trial court ultimately denied defense counsels' motion to strike.[3]

Now, on appeal, Appellant contends that the trial court erred by not striking Sgt. Pinkerton's direct-examination testimony. We need not delve

---

[3] It seems that the trial court misunderstood defense counsels' motion to strike as pertaining to the *cross-examination* testimony of Sgt. Pinkerton, and declined to strike that evidence because it had been elicited by the defense. *See id.* at 227; *see also* TCO at 9. However, our review of the record demonstrates that the defense was asking the court to strike the *direct-examination* testimony by Sgt. Pinkerton regarding Pagan's identification. *See* N.T. Trial, 1/22/15, at 226. Notwithstanding the court's misapprehension in this regard, it is well-established that we may affirm the trial court "on any valid basis, as long as the court came to the correct result…." *Wilson v. Transport Ins. Co.*, 889 A.2d 563, 577 n.4 (Pa. Super. 2005) (citations omitted).

into the specifics of his argument, nor determine if he is correct, as we agree

with the Commonwealth that this purported error was harmless.

> Harmless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict. ***Commonwealth v. Robinson***, 554 Pa. 293, 721 A.2d 344, 350 (1999).

***Commonwealth v. Stallworth***, 781 A.2d 110, 120 (Pa. 2001).

Here, the Commonwealth maintains that any prejudicial effect of Sgt.

Pinkerton's direct-examination testimony was insignificant, and could not

have impacted the verdict when compared to the overwhelming

circumstantial evidence that proved Appellant and Ayala committed the

shooting. We agree. Namely, Pagan took the stand and testified that the

two people he saw at the scene of the vehicle accident were the same "two

people that [he] saw outside with guns and shooting at [the victim]…." N.T.

Trial, 1/22/15, at 180. In addition to Pagan's identification, the

Commonwealth presented evidence demonstrating that Appellant and Ayala

fled from police and, when their vehicle ultimately crashed, the firearm used

in the shooting was found inside the car, and a second gun was found along

their route of flight. In light of this evidence, we are convinced that the

jury's verdict did not hinge on Sgt. Pinkerton's direct-examination statement

indicating that he heard Pagan identify Appellant and Ayala at the scene of

the vehicle crash. Therefore, Appellant's second issue fails, as any error by the court in not striking Sgt. Pinkerton's testimony was harmless.

In Appellant's third and final issue, he challenges the weight of the evidence sustaining the jury's verdict. To properly preserve a challenge to the weight of the evidence, that claim must be raised before the trial court. Pa.R.Crim.P. 607(A) (stating that a claim that the verdict was against weight of evidence must be raised before trial court orally or in a written motion prior to sentencing, or in a post-sentence motion). Appellant did not file a post-sentence motion raising this issue, and he fails to point to where in the record he preserved this claim prior to sentencing. Pa.R.A.P. 2119(e) (directing that the appellant must set forth in the argument portion of his brief where in the record he preserved the issue before the trial court). Accordingly, we agree with the trial court that Appellant waived his weight-of-the-evidence claim for our review. *See* TCO at 12.

Judgment of sentence affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/28/2016

- 12 -