J-S31033-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JAMIE PAUL MCVICKER :
:
: No. 1623 WDA 2018

Appeal from the Judgment of Sentence Entered July 12, 2018
In the Court of Common Pleas of Somerset County Criminal Division at
No(s):  CP-56-CR-0000229-2017

BEFORE:  OLSON, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:            **FILED SEPTEMBER 13, 2019**

Jamie Paul McVicker appeals the judgment of sentence entered in the Court of Common Pleas of Somerset County. McVicker argues the trial court abused its discretion in admitting hearsay statements under the excited utterance exception and challenges his conviction and sentence for attempted third-degree murder. We conclude that, even if the trial court abused its discretion in admitting the hearsay statements under the excited utterance exception, any error was harmless. We agree with the parties and the trial court that attempted third-degree murder is not a cognizable offense in Pennsylvania and we therefore reverse the conviction for attempted third-degree murder, vacate the accompanying sentence, and remand for resentencing.

In February 2017, McVicker was charged with criminal homicide, attempt to commit criminal homicide, possession of instruments of crime, and

two counts each of aggravated assault, simple assault, and recklessly endangering another person.[1] The charges resulted from the shooting of Britteny Kyle and Tyrell Ferguson. Kyle died as a result of the shooting and Ferguson was wounded.

The trial court set forth the facts, including:

> At approximately 11:11 p.m. on February 26, 2017, the Somerset County 911 Communications Center (hereinafter, "Somerset County 911") received a call from Tyrell Ferguson regarding a domestic disturbance in progress at . . . [McVicker's] residence at the time. As the audio from the 911 call reveals, the initial moments of the call are chaotic and the voice of the victim, Britteny Kyle, can be heard in the background yelling for help. Given the nature of the call and location of the caller, the 911 operator, Craig Nicholson, began transferring the call to Pennsylvania State Police (hereinafter, PSP) for further assistance from law enforcement. Shortly after the PSP Police Communications Operator Neil Clay received the call at 11:12 p.m., and with both operators still on the line, multiple gunshots are heard over the phone along with the cries of both victims.
>
> [An excerpt from the call was played for the jury.]
>
> While there is a discrepancy between the testimony of the two operators regarding the number of gunshots heard on the 911 call,[1] nevertheless, and as the transcript from the call indicates, Ferguson relayed to dispatchers that Kyle had been shot in the throat by her ex-boyfriend, [McVicker], and was dead. Ferguson, grazed from a bullet and bleeding, fled into a field and the woods surrounding the residence . . . fearing that [McVicker] was chasing him. When asked by Clay whether he had any weapons, Ferguson responded, "No, I just - we just got off work." Clay inquired further as to the type of firearm used by [McVicker] in the assault, and

---

[1] 18 Pa.C.S.A. §§ 2501, 901, 907(a), 2702(a)(4), 2701(a)(1), and 2705, respectively.

while Ferguson was unable to provide an answer, he stated simply, "[h]e does have weapons."

> [1] Nicholson testified that three gunshots were fired during the call with Ferguson. Clay stated, in contrast, that he heard two.

At trial, Ferguson testified that around 10:30 p.m. on the evening of February 26, 2017, he and Kyle, who were co-workers at SCI-Laurel Highlands in Somerset, PA, travelled to [McVicker's] residence to collect her cats following the conclusion of their work shifts. According to Ferguson, he and Kyle had begun dating in January of 2017, around the time that Kyle's relationship with [McVicker] was ending and she was in the process of moving her belongings out of [McVicker's] residence. As Ferguson indicated, Kyle and [McVicker] "didn't have a good relationship at all." On that particular evening, Kyle received a text message from [McVicker] stating that "she needed to get her cats out of the house." Ferguson testified that while Kyle was reluctant to pick up her cats when [McVicker] was at his residence, the text message she received from [McVicker] suggested that he would not be home that evening. Testimony at trial demonstrated that Kyle's reluctance in this regard was well-founded. Over the objection of [McVicker], the Commonwealth presented testimony regarding a prior domestic disturbance between Kyle and [McVicker] in the early morning hours of December 1, 2016. On that morning, according to the testimony Kyle's mother, Rhonda Bittner, Kyle fled [McVicker's] residence to a nearby bar after a confrontation with [McVicker], telling her mother that [McVicker] had fired a shot at her. Kyle called her parents from inside the bar seeking help, and when they arrived to pick her up, she was "hysterical . . . crying, shaking."

As Kyle and Ferguson approached Boswell that evening, they decided to stop for a drink at Merchant's Bar near [McVicker's] residence, but quickly left after the bar owner, Matthew Reinbold, indicated that [McVicker] was there. The couple decided to quickly drive to [McVicker's] residence to retrieve Kyle's cats while [McVicker] remained at the bar. According to Ferguson, [McVicker's] residence was a roughly ten-minute drive from Merchant's Bar. Upon arriving at the residence, Kyle parked near the rear entrance of the house, turned off the vehicle, and went inside

[McVicker's] home to retrieve her cats. As Ferguson recalled, he remained in the car, playing games on his cell phone. Kyle emerged moments later with one of her cats, and mentioned to Ferguson that the other had run off and hid in the house, prompting her to return inside. Moments later, according to Ferguson, Kyle started "screaming at the top of her lungs like help me, help." As a result, Ferguson called 911 and waited for Kyle to come out of the house. Kyle emerged from the house in a panic and got back into the vehicle with Ferguson. As they struggled to get the keys into the ignition, [McVicker] fired a shot at the vehicle, shattering one of its windows. Ferguson, seated in the passenger's seat, looked out of the driver's side window and saw [McVicker] standing on the porch, with a gun "at [the] center mass of his body." After another shot from [McVicker's] weapon, Kyle went silent, and the car drifted into a line of trees and brush near [McVicker's] residence. Ferguson, having determined that Kyle was dead, exited the vehicle and fled into the woods.

[When the officers arrived on the scene, they] located the victim's vehicle resting in a field southwest of [McVicker's] residence with its taillights on and proceeded towards its location. As they approached, the officers could see that the glass in the driver's side window was shattered and that Britteny Kyle was slumped-over in the driver's seat. According to [PSP Trooper Jeffrey Flowers], the victim was motionless and appeared to be deceased, with noticeable blood around her neck area. Shortly thereafter, troopers discovered Tyrell Ferguson in a dense, swampy field near the scene and immediately escorted him to an awaiting ambulance. According to Flowers, Ferguson was "very disheveled, he had no shoes on, his pant legs [were] muddy, and there [was] a large red stain square in the middle of his chest." A medical exam performed on Ferguson would later confirm that he suffered a gunshot wound from apparent bullet fragments which grazed his chest, abdomen and right leg.

As Trooper Flowers relayed information regarding the crime scene back to the PSP barracks, a second vehicle arrived on the scene carrying David McVicker, [McVicker's] father. According to [David], [McVicker] had been with his cousin Brian McVicker earlier in the evening and had called his father to tell him that he was in some trouble and "was going

off to kill himself." Testimony from Brian McVicker confirmed that on the evening of February 26, 2017, prior to the shooting, he and his cousin, Michael McVicker, had been drinking with [McVicker] at various local bars. After having a few drinks at Merchant's Bar, Brian and Michael dropped [McVicker] off at his residence because [McVicker] had stated that Kyle was coming to pick up her cats. When Michael and Brian returned to Merchant's Bar, Brian received a call from [McVicker] in which [McVicker] stated he had "shot [Kyle's] car up" and that "he thought he might have hit someone because the car drifted down into the bottom."

PSP troopers at the scene soon received notification that [McVicker] had been located in Conemaugh Township and was in the custody of Officer Russell Miller, a patrolman with the Conemaugh Township Police Department. Officer Miller had been on patrol when he received word around 11:15 p.m. that an assault had occurred earlier . . . in Jenner Township, and that the State Police were looking for [McVicker]. At 12:15 a.m., he observed [McVicker] turning onto Pine Street in Davidsville, PA, and after following the car briefly, he stopped the vehicle and placed [McVicker] into his custody. When asked by Miller if he had any weapons, [McVicker] replied "[n]o, it's at the house."

Trooper Flowers, along with Sergeant Steven Adamczyk of the PSP, travelled to Conemaugh Township and arrived to find [McVicker] in handcuffs in the back of Officer Miller's police unit. When asked by Trooper Flowers if he was all right, [McVicker] indicated that he was. According to Flowers, [McVicker] did not appear rattled or disheveled, but did have a small spot of blood on his pants. Trooper Flowers further inquired as to the whereabouts of [McVicker's] cousin Brian McVicker, and [McVicker] stated that he had been with his cousin earlier in the evening but that "he was by himself when it had happened." . . . .

A forensic investigation was conducted by the PSP Criminal Investigation Unit at [McVicker's] residence and surrounding property during the early morning hours of February 27, 2018 [sic]. Evidence recovered at the scene suggested the shooting had occurred at the rear entrance of the residence near a small set of wooden stairs leading up to the first floor of the home. A set of dark tire tracks

identified near the steps indicated that the victim's vehicle made a quick acceleration before drifting roughly 179 feet to its final resting place in a swampy field southwest of the residence. A pile of tempered glass was found approximately three feet from the bottom of the steps. Further investigation of [Kyle's] vehicle revealed that the front driver's side window was shattered and investigators recovered bullet fragments from the front passenger door interior panel. Closer examination of the path travelled by the bullet recovered from the passenger door demonstrated that the shot fired into the vehicle originated "from an elevated position where it would have gone through the glass at a downward angle from - again, not 90 degrees to the window, but slightly back and outward." The significant amount of tempered glass recovered from inside the vehicle, as well as other biological materials, confirmed that the bullets were fired from outside of the vehicle on the driver's side.

The deceased body of the victim, Britteny Kyle, was found in the driver's seat of the vehicle with a large wound to her upper chest area, as well as what appeared to be a wound from a bullet embedded in the right sleeve of her clothing. According to expert testimony from Kevin D. Whaley, M.D., Kyle suffered a fatal gunshot wound from a high-velocity rifle round extending from the front part of her left shoulder down to the upper part of her chest. As Whaley pointed out, the bullet that struck Kyle's body severed a large artery and large vein, as well as her spinal cord, resulting in the victim's instant death.

Consistent with Whaley's findings, a search of [McVicker's] residence recovered spent rifle cartridge casings in different locations of the home - on a step at the rear entrance of the residence, and on a countertop in the kitchen adjacent to the rear entrance. Proceeding further into an unfurnished bedroom, investigators found a wood stock bolt-action rifle (a FFV Sweden .30-06), and upon opening the bolt, recovered another spent cartridge casing. . . .

At trial, [McVicker] admitted to shooting Kyle and Ferguson with a high-powered rifle, but pursued a theory of self-defense. He testified that on the evening of February 26, 2017, he fired three shots from the rear entrance of his residence at the car containing Kyle and Ferguson with a

.30-06 bolt-action rifle loaded with three .270 Winchester shells from roughly 10 feet away.

According to [McVicker], he fired the shots in self-defense because he believed that Ferguson possessed a gun. Following the shooting, [McVicker] left the scene and placed calls to his father, his cousin Brian, and a friend, Daniel Rhoads. As Rhoads recalled, [McVicker] told him that he "might have shot somebody," and was "going to go kill himself." [McVicker] stated that after stopping briefly to discuss the situation with his cousins Brian and Michael, he decided to turn himself in. Moments later, he was pulled-over by Officer Miller of the Conemaugh Township Police and taken into custody.

Trial Court Opinion, filed Feb. 22, 2019, at 4-15.

The jury found McVicker guilty of third-degree murder, attempted third-degree murder, and two counts each of aggravated assault, simple assault, and REAP.[2] In July 2018, the trial court sentenced him to 20 to 40 years' incarceration for the third-degree murder conviction and eight to 16 years' incarceration for the attempted third-degree murder conviction, to be served consecutively. The remaining convictions merged for sentencing purposes.

McVicker filed a post-sentence motion, which the trial court denied. McVicker filed a timely Notice of Appeal.

McVicker raises the following issues:

1. Mr. McVicker's attempted third-degree murder conviction and his 8- to 16-year prison sentence in connection with Tyrell Ferguson's wounds are invalid and unconstitutional under state and federal statutory and decisional law because there is no such criminal offense as attempted third-degree

---

[2] The jury found McVicker not guilty of first-degree murder, voluntary manslaughter, involuntary manslaughter, attempted first-degree murder, and possession of instrument of crime.

- 7 -

murder under Pennsylvania state law. U.S. Const. admts. 6, 8, 14; Pa. Const. art. I, § 8, 9.

2. The trial court erred by permitting Rhonda Bittner and Matt Reinbold to testify to out-of-court statements Brittney Kyle made to them on or about December 1, 2016 where she accused Mr. McVicker of firing a gun at her during an argument they had on or about December 1, 2016. Brittney Kyle's out-of-court statements didn't trigger the excited utterance hearsay exception. The trial court's error wasn't harmless because it's reasonably likely the hearsay testimony may have affected the jury's verdicts. U.S. Const. admts. 6, 8, 14; Pa. Const. art. I, § 8, 9.

McVicker's Br. at 3. We will address McVicker's second claim first.

McVicker claims the trial court abused its discretion when it permitted Rhonda Bittner and Matt Reinhold to testify to Kyle's December 2016 hearsay statements that McVicker fired a gun at her. He argues that the statements were inadmissible because the Commonwealth did not present "independent evidence establishing the 'startling event'"—the firing of the gun at Kyle—had occurred. McVicker's Br. at 24. He relies on cases in which the statements were deemed inadmissible because "the excited utterance itself [was] being used to prove that an exciting event did, in fact, occur." *Id.* at 26 (quoting *Commonwealth v. Barnes*, 456 A.2d 1037, 1040 (Pa.Super. 1983) and *Commonwealth v. Keys*, 814 A.2d 1256, 1259 (Pa.Super. 2003)).

During trial Kyle's mother, Bittner, testified that in December 2016, Kyle told her, "He shot through the wall at her." N.T., 5/18/18, at 3.496. When she made the statement Kyle was "[u]pset, very worked up, upset. She was hysterical. She was crying, shaking." *Id.* at 3.495. The owner of Merchants Bar, Matthew Reinhold, similarly testified that on that same December night

Kyle told him that, "Jamie pointed a gun at her and fired a round by her head." *Id.* at 3.526. Both witnesses also testified that the relationship between McVicker and Kyle was ending. *Id.* at 3.497, 3.501, 3.538. Further, Bittner testified that when they arrived at McVicker's residence that evening, Kyle's belongings were strewn across the lawn and that Kyle had been slowly moving things from McVicker's residence. *Id.* at 3.497, 3.501.

McVicker objected to the admission of the statements regarding the gun shot as inadmissible hearsay. The court admitted the statements, finding they qualified for the excited utterance exception to the rule precluding the admission of hearsay statements. The trial court instructed the jury that the jury could not use the testimony of Bittner or Reinhold as bad character evidence, but could use it as proof of the history of the case:

> [T]o say to yourself: Jamie McVicker is a bad guy, and so he must have committed the crimes that he's charged with in this case. You can't conclude from that testimony – you can't use it to conclude that he has a bad character; and, therefore, he must have committed the crimes here. You are absolutely prohibited from using it for that purpose.
>
> You may use it, if you wish, but you don't have to, if you wish, as proof of the history of the case; what the relationship was in the months immediately preceding this incident between Jamie McVicker and Britteny Kyle; and you may also use it, if you wish, as proof of Jamie McVicker's state of mind towards Britteny Kyle on the night of the incident that gave rise to the charges. You may use it for those purposes. You cannot use it for the other one.

*Id.* at 3.520-3.521, 3.539.

"Hearsay is defined as 'a statement, other than one made by the declarant while testifying at trial or hearing, offered in evidence to prove the

truth of the matter asserted.'" ***Commonwealth v. Cunningham***, 805 A.2d 566, 572 (Pa.Super. 2002) (quoting Pa.R.Evid. 801(c)). Hearsay is inadmissible "except as provided by [the Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.Evid. 802. One exception to the hearsay rule is the excited utterance exception which provides:

> (2) Excited Utterance. A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused. When the declarant is unidentified, the proponent shall show by independent corroborating evidence that the declarant actually perceived the startling event or condition.

Pa.R.Evid. 803(2). To qualify for this exception, the party seeking the statement's admission must establish "that [the declarant] had witnessed an event sufficiently startling and so close in point of time as to render her reflective thought processes inoperable and . . . that her declarations were a spontaneous reaction to that startling event." ***Commonwealth v. Murray***, 83 A.3d 137, 157-58 (Pa. 2009) (quoting ***Commonwealth v. Sherwood***, 982 A.2d 483, 496 (Pa. 2009)) (alteration in original).

Here, we decline to reach whether admission of the statements was an abuse of discretion, because we find that, even if the statements were inadmissible, any error was harmless.

An error is harmless if

> (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence

- 10 -

which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Stallworth*, 781 A.2d 110, 120 (Pa. 2001) (quoting *Commonwealth v. Robinson,* 721 A.2d 344, 350 (Pa. 1999)) (italics added). "The Commonwealth bears the burden of establishing the harmlessness of the error." *Commonwealth v Laich*, 777 A.2d 1057, 1062 (Pa. 2001).

Third-degree murder is defined as "'all other kinds of murder,' i.e., those committed with malice that are not intentional (first-degree) or committed during the perpetration of a felony (second-degree)." *Commonwealth v. Packer*, 168 A.3d 161, 168 (Pa. 2017). "The elements of third-degree murder, as developed by case law, are a killing done with legal malice." *Commonwealth v. Marquez*, 980 A.2d 145, 148 (Pa.Super. 2009) (*en banc*) (quoting *Commonwealth v. MacArthur,* 629 A.2d 166, 167–68 (Pa.Super. 1993)). Malice "comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured." *Packer*, 168 A.3d at 168 (quoting *Commonwealth v. Drum*, 58 Pa. 9, 15 (1868)). "[M]alice may be inferred from the use of a deadly weapon on a vital part of the victim's body." *Commonwealth v. Gooding,* 818 A.2d 546, 550 (Pa.Super. 2003)

(quoting **Commonwealth v. Gonzales**, 609 A.2d 1368, 1369 (Pa.Super. 1992)).

To establish aggravated assault under the applicable subsection the Commonwealth had to establish McVicker "attempt[ed] to cause or intentionally or knowingly cause[d] bodily injury to another with a deadly weapon." 18 Pa.C.S.A. § 2702(a)(4).

McVicker claimed he acted in self-defense. The elements of self-defense are: "(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." **Commonwealth v. Mouzon**, 53 A.3d 738, 740 (Pa. 2012) (quoting **Commonwealth v. Samuel**, 590 A.2d 1245, 1247–48 (Pa. 1991)) (alterations in original); 18 Pa.C.S.A. § 505.

"When a defendant raises the issue of self-defense, the Commonwealth bears the burden to disprove such a defense beyond a reasonable doubt." **Commonwealth v. Bullock**, 948 A.2d 818, 824 (Pa.Super. 2008) (quoting **Commonwealth v. Emler**, 903 A.2d 1273, 1279 (Pa.Super. 2006)). "The Commonwealth sustains this burden if it establishes at least one of the following: (1) the accused did not reasonably believe that he was in danger of death or serious bodily injury; (2) the accused provoked or continued the use of force; or (3) the accused had a duty to retreat and the retreat was possible

- 12 -

with complete safety." ***Commonwealth v. Ventura***, 975 A.2d 1128, 1143 (Pa.Super. 2009) (citing ***Commonwealth v. McClendon***, 874 A.2d 1223, 1230 (Pa.Super. 2005)). "The Commonwealth need only prove one of these elements beyond a reasonable doubt to sufficiently disprove a self-defense claim." ***Id.*** (citing ***Commonwealth v. Burns***, 765 A.2d 1144, 1149 (Pa.Super. 2000)).

Here, the Commonwealth presented overwhelming evidence that on the night of the shooting McVicker shot Kyle and Ferguson from his porch while they were in their car trying to leave the premises. McVicker used a deadly weapon on a vital part of both Kyle's and Ferguson's bodies. There was no evidence Kyle and Ferguson had any weapon, except McVicker's claim that he saw Ferguson with a gun. Further, although McVicker made many calls after the shooting, he did not tell anyone that he had acted in self-defense or that he was attacked. Rather, he shot a gun into a car that was attempting to leave his property. The evidence presented was sufficient to establish third-degree murder and sufficient to disprove McVicker's claim of self-defense, as it disproved that McVicker reasonably believed he was in imminent danger of death or serious bodily injury and it disproved that he did not have an ability to retreat, as he could have retreated into his home. Therefore, if the court erred in admitting statements that McVicker shot a gun at Kyle in December, any error would be harmless. ***See Commonwealth v. Green***, 76 A.3d 575, 582-83 (Pa.Super. 2013) (concluding harmless error in admission of victim's hearsay statement where there was sufficient and compelling evidence of

defendant's guilt besides the hearsay evidence); *see also Commonwealth v. Levanduski*, 907 A.2d 3, 22 (Pa.Super. 2006) (*en banc*) (concluding admission of victim's statement was harmless error where there was other overwhelming evidence of defendant's guilt).

McVicker also claims there is no criminal offense in Pennsylvania for attempted third-degree murder. He argues that the conviction and sentence for attempted third-degree murder must be vacated, and that we should remand to the trial court for re-sentencing. The trial court and the Commonwealth concede that McVicker is entitled to relief on this claim. We agree.

McVicker did not object to the jury instruction on attempted murder, which included an instruction that the jury could find McVicker guilty of attempt to commit third-degree murder. N.T., 5/23/18, at 6.837, 6.839. However, he claims that his sentence is illegal because it is for a conviction for a crime that does not exist. Such a claim cannot be waived. *See Commonwealth v. Batts*, 163 A.3d 410, 434 (Pa. 2017) (citation omitted) ("A challenge to the legality of a particular sentence may be reviewed by any court on direct appeal; it need not be preserved in the lower courts to be reviewable and may even be raised by an appellate court *sua sponte*.").

In Pennsylvania, "there simply is no such crime as attempted second or third degree murder." *Commonwealth v. Geathers*, 847 A.2d 730, 734 (Pa.Super. 2004) (quoting *Commonwealth v. Williams*, 730 A.2d 507, 511 (Pa.Super. 1999)). Courts have reasoned:

> A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime. 18 Pa.C.S.A. § 901. Murder of the second or third degree occurs where the killing of the victim is the unintentional result of a criminal act. Thus, an attempt to commit second or third degree murder would seem to require proof that a defendant intended to perpetrate an unintentional killing—which is logically impossible. While a person who only intends to commit a felony may be guilty of second degree murder if a killing results, and a person who only intends to inflict bodily harm may be guilty of third degree murder if a killing results; it does not follow that those persons would be guilty of attempted murder if a killing did not occur. They would not be guilty of attempted murder because they did not intend to commit murder—they only intended to commit a felony or to commit bodily harm.

*Id.* (quoting *Commonwealth v. Griffin*, 456 A.2d 171, 177–178 (Pa.Super. 1983)).

Here, McVicker was convicted and sentenced for a crime that does not exist—attempted third-degree murder. We will therefore reverse the conviction for attempted third-degree murder of Ferguson, vacate the sentence imposed for it, and remand for re-sentencing.

Conviction for attempted third-degree murder reversed. Judgment of sentenced affirmed in part and vacated in part. Case remanded for resentencing. Jurisdiction relinquished.

Judge Stabile joins the memorandum.

Judge Olson concurs in the result.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/13/19