J-S45003-22, J-S45004-22, S45005-22, S45006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DANTE FOUNTAIN | : | |
| | : | |
| Appellant | : | No. 2080 EDA 2021 |

Appeal from the Judgment of Sentence Entered April 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002318-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DANTE FOUNTAIN | : | |
| | : | |
| Appellant | : | No. 2081 EDA 2021 |

Appeal from the Judgment of Sentence Entered April 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002320-2018

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DANTE FOUNTAIN | : | |
| | : | |
| Appellant | : | No. 2082 EDA 2021 |

Appeal from the Judgment of Sentence Entered April 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002321-2018

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                     :         PENNSYLVANIA
                                     :

              v.                      :
                                     :
                                     :

DANTE FOUNTAIN                :
                                   :

          Appellant        :     No. 2162 EDA 2021

Appeal from the Judgment of Sentence Entered April 2, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002319-2018

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY OLSON, J.:             **FILED APRIL 5, 2023**

Appellant, Dante Fountain, appeals *nunc pro tunc* from the judgments of sentence entered April 2, 2019, as made final by the denial of his post-sentence motions on October 5, 2021.  We quash, in part, and affirm, in part.

The relevant facts and procedural history of this case are as follows.  On September 28, 2017, Appellant forcibly entered the home of complainant, Dominique Starks, where she lived with three children.  Ultimately, an altercation ensued upon which, Appellant struck Stark and her five-month-old child, Za.S.[1]

Thereafter, the Commonwealth filed bills of information against Appellant.  At docket number CP-51-CR-0002318-2018 ("Docket Number 2318-2018"), the Commonwealth charged Appellant with possession of a firearm prohibited, possession of a firearm without a license, carrying a

---

[1] Initials are used to protect the identity of the minor child.

firearm on a public street in Philadelphia, making terroristic threats, simple assault, recklessly endangering another person ("REAP"), possession of an instrument of a crime ("PWIC"), burglary, criminal trespass and conspiracy. At docket number CP-51-CR-0002320-2018 ("Docket Number 2320-2018"), the Commonwealth charged Appellant with simple assault, REAP, aggravated assault, and PWIC. At docket number CP-51-CR-0002319-2018 ("Docket Number 2319-2018"), the Commonwealth charged Appellant with endangering the welfare of a child ("EWOC"), making terroristic threats, simple assault, REAP, aggravated assault and PWIC. Finally, at docket number CP-51-CR-0002321-2018, ("Docket Number 2321-2018"), the Commonwealth charged Appellant with simple assault, REAP and PWIC.

Appellant's jury trial commenced on January 31, 2019. On February 4, 2019, the jury found Appellant guilty of aggravated assault, two counts of simple assault, making terroristic threats, three counts of EWOC, and criminal trespass.[2] On April 2, 2019, the trial court sentenced Appellant to 105 months to 25 years' imprisonment.

Appellant filed a post-sentence motion pursuant to Pa.R.Crim.P. 720 on April 9, 2019. Appellant, however, only filed the post-sentence motion at Docket Number 2318-2018. Post-Sentence Motion, 4/9/19, at *1-*3 (unpaginated). Hence, Appellant did not file post-sentence motions at Docket Number 2320-2018, Docket Number 2319-2018 or Docket Number

---

[2] 18 Pa. C.S.A. §§ 2702(a)(9), 2701(a), 2706(a)(1), 4304(a)(1) and 3503(a)(1), respectively.

2321-2018. On August 7, 2019, Appellant's post-sentence motion, filed only at Docket Number 2318-2018, was denied by operation of law. **See** Pa.R.Crim.P. 720(B)(3)(a).

On August 30, 2019, Appellant filed a *pro se* petition under the Post-Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541–9546. PRCA Petition, 8/30/19, at 1-10. The trial court[3] appointed PCRA counsel on September 5, 2019. Trial Court Order, 9/5/19, at 1. On February 17, 2020, counsel filed an amended PCRA petition in which he claimed that trial counsel was ineffective for including only one docket number on the April 9, 2019 post-sentence motion and for failing to file a direct appeal. Amended PCRA Petition, 2/17/20, at 3, 11-18. On August 11, 2020, the Commonwealth filed a response, indicating that it did not oppose the reinstatement of Appellant's appellate rights. Commonwealth Response, 8/11/20, at 6. On May 25, 2021, the court reinstated Appellant's right to file post-sentence motions and Appellant's appellate rights *nun pro tunc*. Trial Court Order, 5/25/21, at 1-2. Appellant filed post-sentence motions at all four trial court dockets on May 31, 2021. The post-sentence motions were subsequently denied by operation of

_____

[3] Under normal circumstances, upon the filing of the PCRA petition, we would refer to the trial court as a PCRA court. In this instance, however, the court's role reverted in and out of PCRA status. For simplicity, we will refer to the court as the "trial court."

law on September 28, 2021. **See** Pa.R.Crim.P. 720(B)(3)(a). This appeal followed.[4]

Before we address the merits of Appellant's appeal, we must first address whether we have jurisdiction over the underlying PCRA petition. "The timeliness requirement for PCRA petitions is mandatory and jurisdictional in nature." **Commonwealth v. Montgomery**, 181 A.3d 359, 365 (Pa. Super. 2018) (*en banc*), *appeal denied*, 190 A.3d 1134 (Pa. 2018) (cleaned up). A PCRA petition is timely if it is "filed within one year of the date the judgment [of sentence] becomes final." 42 Pa.C.S.A. § 9545(b)(1). "[A] judgment [of sentence] becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." 42 Pa.C.S.A. § 9545(b)(3); **see also** Pa.R.A.P. 903(a) (explaining that an appellant has "30 days after the entry of the order from which the appeal is taken" to file an appeal).

"It is well-settled that '[a] PCRA petition may only be filed after an appellant has waived or exhausted his direct appeal rights.'" **Commonwealth v. Smith**, 244 A.3d 13, 17 (Pa. Super. 2020) (quotation omitted). "Indeed, '[t]he PCRA provides petitioners with a means of collateral

---

[4] Appellant filed his notices of appeal on October 21, 2021. On October 27, 2021, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant timely complied. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on April 28, 2022. All issues raised on appeal were included in Appellant's concise statement.

review, but has no applicability until the judgment of sentence becomes final.'" *Id*. (quotation omitted). Therefore, a PCRA petition filed before the judgment of sentence becomes final is considered a "premature petition" and "does not constitute a first PCRA petition." *Commonwealth v. Kubis*, 808 A.2d 196, 198 n.4 (Pa. Super. 2002). Instead, it is considered a legal nullity and, as such, the PCRA court must "dismiss[] the PCRA petition without prejudice as premature." *Commonwealth v. Leslie*, 757 A.2d 984, 985 (Pa. Super. 2000) (internal citation omitted); *see Commonwealth v. Neisser*, 2020 WL 603614, at *3 (Pa. Super. Feb. 7, 2020) (unpublished memorandum) (holding that the appellant "filed his PCRA petition prior to the finality of his judgment of sentence" and, as such, the appellant's "filing was a legal nullity, and the PCRA court lacked authority to consider it and should have dismissed it without prejudice toward [the a]ppellant's right to file a PCRA petition once the time for him to file a direct appeal had expired").

Herein, Appellant was charged and convicted at four separate dockets: Docket Number 2318-2018; Docket Number 2320-2018; Docket Number 2319-2018; and Docket Number 2321-2018. The trial court sentenced Appellant on April 2, 2019. Appellant filed a timely post-sentence motion on April 9, 2019, but only at Docket Number 2318-2018. The post-sentence motion, filed only at Docket Number 2318-2018, was denied by operation of law on August 7, 2019. *See* Pa.R.Crim.P. 720(B)(3)(a). Hence, Appellant's judgment of sentence as to Docket Number 2318-2018 was not final until September 7, 2019, 30 days after his post-sentence motion was denied by

operation of law. **See id.** Appellant, however, filed a *pro se* PCRA petition at all four trial court dockets on August 30, 2019, before the time for filing an appeal expired at Docket Number 2318-2018 and, hence, before his judgment of sentence became final in that matter. "Ergo, [Appellant's] PCRA petition [with regard to Docket Number 2318-2018] was premature." **Neisser**, 2020 WL 603614 at *2. Consequently, Appellant's PCRA petition at Docket Number 2318-2018, as well as the court's order granting it, were legal nullities. **Id.** For this reason, Appellant's appeal with respect to Docket Number 2318-2018 is subject to quashal. **See id.** ("Case law is clear that a premature PCRA petition must be quashed."); **see also Smith**, 244 A.3d at 17 (quashing appeal because the appellant filed a PCRA petition prior to his judgment of sentence becoming final, rendering the PCRA petition and the PCRA court's order denying it legal nullities). Based upon the foregoing, we are constrained to quash Appellant's appeal at Docket Number 2318-2018.[5]

This does not end our inquiry, however. As stated above, Appellant was charged and convicted at four separate dockets and only filed his April 9, 2019 post-sentence motion at Docket Number 2318-2018. Appellant therefore did not file post-sentence motions at Docket Number 2320-2018, Docket Number 2319-2018 or Docket Number 2321-2018, rendering his judgments of sentence at the aforementioned dockets final on May 2, 2019, 30 days after the imposition of his sentence. **See** Pa.R.Crim.P. 720 ("If the defendant does

---

[5] Docket Number 2318-2018 corresponds to Superior Court Docket Number 2080 EDA 2021.

not file a timely post-sentence motion, the defendant's notice of appeal shall be filed within 30 days of imposition of sentence."). Thus, the PCRA petition filed at all four trial court dockets on August 30, 2019 was filed after his judgments of sentence became final at Docket Number 2320-2018, Docket Number 2319-2018 and Docket Number 2321-2018. As to those court dockets, Appellant's PCRA petition was not premature. We therefore have jurisdiction over Appellant's appeal with respect to Docket Number 2320-2018, Docket Number 2319-2018 and Docket Number 2321-2018.

Appellant raises the following issues on appeal:

1. Whether the verdict was against the weight of the evidence?

2. Whether Appellant's sentence was unduly harsh and excessive?

3. Whether the court erred in granting the Commonwealth's motion to introduce two prior bad acts stemming from previous allegations of domestic violence as the prejudicial value outweighed the probative value?

4. Whether the court erred in allowing the Commonwealth to introduce two prior bad acts into evidence where notice was not given to the defen[s]e pursuant to [Pa.R.E.] 404(B)(3)?

Appellant's Brief at 9 (unnecessary capitalization omitted).

We have carefully reviewed the certified record, the submissions of the parties, the opinions of the trial court, and the pertinent case law. Based upon our review, we conclude for the reasons expressed by the trial court that Appellant is not entitled to relief on any of his claims. Moreover, as we find that the trial court has adequately and accurately addressed the issues raised in this appeal, we adopt the trial court's opinion as our own. Accordingly, the

parties are directed to attach a copy of the trial court's April 28, 2022 opinion to all future filings relating to our disposition in this appeal.

Appeal quashed with respect to Docket Number 2318-2018 (Superior Court Docket Number 2080 EDA 2021). Judgments of sentence affirmed at the remaining docket numbers.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/05/2023

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CRIMINAL TRIAL DIVISION**

| | | |
|---|---|---|
| **COMMONWEALTH** | : | **CP-51-CR-0002318-2018** |
| | | **CP-51-CR-0002320-2018** |
| | | **CP-51-CR-0002321-2018** |
| | : | **CP-51-CR-0002319-2018** |
| | | |
| **vs.** | : | |

**: FILED**

APR 2 8 2022

Appeals/Post Trial
Office of Judicial Records

**DANTE FOUNTAIN**

**SUPERIOR COURT**
2080 **EDA 2021**
**2081 EDA 2021**
**2082 EDA 2021**
**2162 EDA 2021**

**OPINION**

**BRINKLEY, J.**                                                                            **APRIL 28, 2022**

A jury found defendant Dante Fountain guilty of aggravated assault, two counts of simple
assault, terroristic threats, three counts of endangering the welfare of a child, and criminal
trespass. This Court sentenced him an aggregate sentence of 105 months to 25 years state
incarceration. Defendant appealed this judgment of sentence and raised the following issues: (1)
whether the verdict was against the weight of the evidence; (2) whether the sentence was harsh
and unreasonable; (3) whether the Court erred "in allowing the Commonwealth to introduce two
prior bad acts under Pa.R.E. 404(b) into evidence stemming from previous allegations of
domestic violence between the defendant and the complainant as the prejudicial value
outweighed the probative value;" and (4) whether the Court erred when it allowed "the
Commonwealth to introduce two prior bad acts into evidence in that notice was not given to the
defense pursuant to Pa.R.E. 404(b)(3)." This Court's judgment of sentence should be affirmed.

## PROCEDURAL HISTORY

On September 28, 2017, Defendant forced his way into complainant Domenique Starks' home, threatened her and her three children, and hit both Starks and their 5-month-old son as she held him. Defendant was arrested shortly thereafter. On January 30, 2019, Defendant appeared before this Court for a trial in the presence of a jury. On February 4, 2019, the jury found Defendant guilty of aggravated assault, two counts of simple assault, terroristic threats, three counts of endangering the welfare of a child, and criminal trespass. The jury found him not guilty of burglary. On April 2, 2019, this Court sentenced Defendant as follows:

CP-51-CR-0002320-2018 (5-mo-old victim Za.S.):
Aggravated assault:              44 to 120 months
Endangering Welfare of Child:    44 to 120 months (to run consecutive)

CP-51-CR-0002318-2018 (victim Domenique Starks):
Terroristic Threats:             17 to 60 months
Criminal Trespass:               17 to 60 months (to run consecutive)
Simple Assault:                  No Further Penalty[1]

CP-51-CR-0002319-2018 (10-year-old victim Z.S.):
Endangering the Welfare of a Child:    24 to 48 months

CP-51-CR-0002321-2018 (9-year-old victim N.S.):
Endangering the Welfare of a Child:    24 to 48 months

This resulted in an aggregate sentence of 105 months to 300 months state incarceration, or approximately 8 ¾ to 25 years. On April 9, 2019, Defendant file a post-sentence motion "for a new trial and sentencing." This motion was denied by operation of law on August 7, 2019. He did not file a direct appeal.

On August 30, 2019, Defendant filed a *pro se* petition for relief pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. § 9541 *et seq.* (eff. Jan. 16, 1996), claiming that

---

[1] This Court actually stated at sentencing that "simple assault merges," but it does not merge with terroristic threats or criminal trespass. Therefore, the Court imposed a sentence of No Further Penalty. See signed Sentencing Order, 4/2/19 (attached).

2

trial counsel was ineffective for failing to file a Notice of Appeal on his behalf. On September 9, 2019, Peter A. Levin, Esquire was appointed as PCRA counsel. On February 17, 2020, counsel filed an amended petition, arguing that Defendant's appellate rights should be reinstated *nunc pro tunc*. On August 11, 2020, the Commonwealth filed its Letter Brief, stating that it was not opposed to the reinstatement of Defendant's appellate rights. On May 20, 2021, this Court conducted an evidentiary hearing on the matter. That same day, this Court reinstated Defendant's appellate rights *nunc pro tunc*.

On May 31, 2021, Defendant filed a post-sentence motion, which (1) asked this Court to reconsider the sentence imposed; and (2) requested a new trial, claiming that the verdict was against the weight of the evidence. This was denied by operation of law on October 1, 2021. On October 12, 2021, Defendant filed a Notice of Appeal to Superior Court. On October 27, 2021, this Court ordered that Defendant file a Concise Statement of Errors Complained of on Appeal Pursuant to Pa.R.A.P. 1925(b) and defense counsel did so on November 8, 2021.

## FACTS

On January 30, 2019, Defendant appeared before this Court for a jury trial. First, defense counsel James O'Connell, Esquire argued a Rule 600 motion, which this Court denied. (N.T. 1/30/19, p. 3-8). Next, the Commonwealth argued a 404(b) prior bad acts motion. The Commonwealth sought to admit two instances of domestic violence that had occurred between Defendant and the adult victim Domenique Starks in order to show the ongoing physical abuse over the course of their relationship. The Commonwealth described the two instances as follows: on July 10, 2012, Defendant attacked Starks at a playground, where he punched her, poured bleach in her face, and then instructed his sister to come over and beat Starks with him. As a result, Starks received seven stitches to her face, had a black eye, and suffered chemical burns to

3

her eyes and skin. Defendant was arrested and charged in connection with this attack but the charges were later withdrawn when Starks failed to appear for court. Subsequently, on October 6, 2012, Starks and Defendant got into an argument regarding child support. Defendant hit her until she fell to the ground and then continued to punch her in the face with a closed fist until a bystander pulled him off. Defendant then stole Stark's cell phone and $200 from her purse. Later that same day, Defendant went to Stark's front door and threatened her, displaying a firearm tucked into his waistband. Defendant was arrested and charged for these actions but the case was withdrawn when Starks once again failed to appear at court. Id. at 11-13. The Commonwealth argued that these prior bad acts were more probative than prejudicial because they showed the violent nature of their relationship and how it had evolved. In addition, it would demonstrate "a common plan, scheme or design of the defendant in demonstrating hostility as well as rebutting any false inferences raised by the defense as to fabrication, consent or anything of that nature." Id. at 13-14. The Commonwealth further argued that this would explain Starks' reluctance to cooperate with the police and the Commonwealth in prosecuting Defendant.

Defense counsel responded that the Commonwealth failed to provide reasonable notice of their intent to introduce prior bad acts since he did not receive a copy of the motion until that very morning. The Commonwealth replied that it was unable to speak with Starks until the day before when she had to be arrested in order to get her and her children to cooperate with the prosecution. Prior to trial, defense counsel admitted that he already knew about the two domestic violence cases from 2012 because they already were part of Defendant's criminal extract, but argued that it would be "so prejudicial that outweighs the probative value and I would ask the court to exclude it." Id. at 15-19. This Court noted defense counsel's objection and granted the Commonwealth's motion to introduce this evidence.

4

Ten-year-old Z.S. testified first for the Commonwealth. She stated that in September 2017, she lived with her mother, her cousin N.S., and her infant brother Za.S. She testified that prior to the birth of her brother, Defendant lived with them. Initially, they enjoyed a good relationship but then he started hitting her mother. Z.S. testified that she was "kind of a little scared of him" and that her mother would have bruises on her face. On the day of the offense, Z.S. stated that she was at home alone with her baby brother while her mom and N.S. went to the corner store. Defendant came to the door and told her to let him in, but Z.S. refused. Approximately ten minutes later, her mother returned from the store and tried to enter the house without letting Defendant in, but he pushed his way inside. Z.S. testified that her mother told Defendant she was going to call the police but that Defendant stated he would not leave until she gave him his wallet and watch. Z.S. testified that her mother was holding her baby brother Za.S. during this time; Defendant told N.S. to take the baby but she refused. Defendant then hit Z.S.'s mother and struck Za.S. in the process "on accident." Z.S.'s mother cried out, "he hit my son." Defendant then grabbed the cell phone out of Z.S.'s mother's hand, left the house, and got into a car where his girlfriend was waiting. Z.S. stated that her mother chased him outside and tried to get the phone back, fighting with both Defendant and his girlfriend. Z.S. testified that she told the girlfriend to leave and they drove away soon thereafter. Z.S. stated that when the police arrived, she lied to them and told them that Defendant and his girlfriend had guns because she was "full of anger" at him for hitting her mom. (N.T. 1/31/19, p. 57-76).

Eleven-year-old N.S., Stark's niece, testified next. She stated that on the day in question, Defendant busted into the house demanding his watch and a key. Starks told him to leave repeatedly and Defendant threatened to throw a candle at the television. N.S. testified that Starks and Defendant started fighting, both verbally and physically. She stated that she did not

5

remember where Z.S. and the baby were during the fight, and that she did not remember Defendant speaking to her. After reading her statement to police to refresh her recollection, N.S. testified that Defendant told Starks he was going to punch her if she did not give him the watch and an I.D. card. Defendant then told someone, either N.S. or Z.S., to take the baby from Starks, but that when no one took him, Defendant punched the baby and hit Starks. N.S. testified that she falsely told police that Defendant had a gun because she was so angry about him hitting Starks and the baby. Id. at 80-91.

Domenique Starks testified next. She stated that she and Defendant began an "on and off again" romantic relationship in 2010 that eventually turned physical abusive. She testified that she called the police on him more than once after he hit her but did not follow up by going to court because she was afraid of him. She stated that he lived with her and her children for a few months in 2012, but she kicked him out due to the "altercations." Starks testified that the incident on September 28, 2017 was part of an ongoing argument between her and Defendant. A few days prior, on September 22, she and Defendant were arguing on her front porch, when he pulled her down the steps and then rifled through her pocketbook. He took her cell phone out, smashed it down on the sidewalk, and then began hitting her. Starks stated that after he left with her phone, she broke his Gucci watch in retaliation for taking her phone. Defendant later called and said he was coming over to give her back her phone. Starks ran into him on the sidewalk as she was walking to the corner store to buy milk and he told her he wanted his watch. When she returned to her home, Defendant was waiting by her front door. He pushed his way into the house and became enraged when she told him she broke his watch. He then threatened to bust the television with a candle from the coffee table. Starks testified that Defendant told one of the kids to take the baby from Starks because "I'm about to beat her the F up." Defendant then punched Starks in her

6

face, punched the baby, and took the cell phone (which belonged to N.S.) out of Starks' hand. He ran out of the house and got into a van driven by his girlfriend. Starks fought with both of them but stopped when she heard her kids and baby crying. Starks stated that she called the police several times but that they did not come until she falsely told them that Defendant had a gun. Starks testified that she took the baby to St. Christopher's via ambulance and that he was examined for any injuries to his face. She stated that the swollen red marks on his face turned out to be mosquito bites. (N.T. 2/1/19, p. 7-21).

Starks then testified regarding two previous instances of domestic violence involving Defendant. She stated that on July 10, 2012, she was pregnant and had gone shopping for clothing and bleach. On her way home, she ran into Defendant at a playground, where she confronted him as to whether he had taken the money she was planning to use for an abortion. Defendant became angry, punched her several times, poured the bleach on her face, and then called his sister over to help him beat Starks. Starks stated that she went to the hospital where they flushed her eyes and stitched up the lacerations on her face. She also suffered a miscarriage as a result of this altercation. Id. at 23-27.

Starks further testified that on October 6, 2012, she saw Defendant as she was leaving a bar and told him that she had child support paperwork regarding his daughter from previous relationship at her house. He followed her out of the bar and began screaming at her about her "getting him locked up." Defendant then began punching her in the face, knocking her pocketbook to the ground and spilling its contents. Starks testified that bystanders pulled Defendant off her and she went to the hospital via ambulance, where she discovered her cell phone was gone. After returning home, Starks went to a neighbor's house and used their phone to call the police and make a statement. Later that same day, Defendant arrived at Starks' home

with a gun in his waistband. She admitted that he did not have a gun, however, on the day he hit her and the baby. Id at 27-32.

Starks testified that she did not cooperate with the prosecution because she was "scared" and admitted that she was testifying in Court at this trial only because the police arrested her and she was being forced to do so. The Commonwealth then played a recorded prison phone call between Starks and Defendant, where Defendant stated that he didn't mean to hit the baby. Id. at 32-37.

Latricia Dawson ("Dawson") testified next for the Commonwealth. She stated that she worked as a paramedic for the Philadelphia Fire Department and that she responded to the scene to treat the infant Za.S. Dawson testified that Starks told her "the baby was hit in the face by the dad because she was fighting him and she was holding the baby and he punched the baby in the face." Id. at 48-50. Dawson testified that the baby appeared healthy and responded normally, but that she transported the infant and his mother to the hospital for further testing. Id. at 51.

Next, Detective Chris Casee of the Special Victims Unit testified for the Commonwealth. Detective Casee stated that in 2019, he was asked to help track down Starks in connection with this case so that she and her children could testify before a grand jury. He stated that he asked the children's school to call Starks to come in, after which she was arrested by Detective Casee. At that same time, her children were transported separately to the grand jury so they could give testimony in this matter. Id. at 54-58.

Police Officer James Gedraitis testified that he and his partner Officer Ryan Struble responded to a radio call for a person with a gun at 2248 North Gratz Street. When they arrived on the scene, Officer Gedraitis was met by Starks, who was crying and holding her baby. Officer Gedraitis stated that Starks told him she was assaulted by the child's father, who attacked her

8

while she was holding the baby. Starks told him that Defendant punched the baby in the face, pulled a gun and threatened Starks' daughter with the gun. Officer Gedraitis stated that he completed the 7548-D form, where he described Stark as "shaken" and that she was covered with "scratches on her face and neck." Id. at 61-67.

Next Police Officer John Keen testified for the Commonwealth. He stated that he arrested Defendant pursuant to an arrest warrant. Id. at 67-69.

Detective Karl Diaz, a member of the Special Victims Unit, testified that he was the assigned investigator in this case. He stated that he interviewed Z.S. and N.S at the police station while Detective McGouldrick interviewed Starks. Id. at 73-79.

At the conclusion of this testimony, the Commonwealth entered its exhibits into evidence and rested. The defense did not call any witnesses and rested.

On February 4, 2019, the jury returned with a verdict, finding Defendant guilty of criminal trespass, two counts of simple assault, terroristic threats, and three counts of endangering the welfare of a child. The jury found Defendant not guilty of burglary. (N.T. 2/4/19, p. 71-76).

On April 2, 2019, Defendant appeared before this Court for sentencing. Nina Greenberg, on behalf of the Commonwealth, recommended an aggregate sentence of 12 to 24 years incarceration, a sentence in the aggravated range. Ms. Greenburg argued that an aggravated sentence was appropriate because Defendant continued to deny any responsibility for the offenses and that Defendant had lied regarding his drug use and involvement in gun violence. Ms. Greenburg further argued that Defendant's lengthy criminal history showed he had been engaged in gun and drug related criminal activity his entire life, and that his domestic abuse of Starks and other women had been ongoing for years. (N.T. 4/2/19, p. 13-21).

9

Starks testified next that this experience "physically drained" her and that she lost custody of her children because of it. She stated that Defendant had made a mistake, but was a "good person" and a "great father," and that incarcerating him would "do more damage than good." Id. at 23-15.

Todd McGarvey, a child advocate who had been representing Z.S., N.S. and Za.S since 2017, spoke next. He stated that the children were put into foster care during the trial and that there had been "a lot of fear and a lot of concern and uncertainty" for their mother, particularly in light of Defendant's history of gun violence. He asked that this Court impose a stay-away order and consider domestic violence probation upon release. McGarvey stated that N.S., Starks' niece, had not been returned to Starks' care because N.S. did not want to go home. Id. at 26-30.

Defense counsel argued that Defendant was "trying to hold a family together as best he can," and recommended a concurrent sentence "on the low side of the grid." Id. at 36.

Dina Gill ("Gill"), a prison medical case manager with the Philadelphia Linkage Program, testified that she had been working with Defendant in prison since 2017. She stated that she and Defendant had worked on a plan for after his release and that Defendant had agreed to work with Gill's program to receive medical care, identification, transportation, mental health treatment, drug and alcohol treatment, housing and counseling. Id. at 37-39.

Reginald Hill, Defendant's cousin and pastor, testified next. He stated that "everyone deserved a chance" and asked this Court for leniency. Id. at 43.

Defendant's mother, Jennetta Fountain ("J. Fountain"), testified that her son's behavior was the result of him not having a father-figure in his life growing up and that he was "acting out." She stated that she did not understand how Starks could say Defendant hit her and her baby and then still visit Defendant in prison. J. Fountain testified that her son had a "rough life" and

10

was caught up in life on the streets. She asked this Court to have mercy on Defendant. Id. at 44-45.

Kenicia Fountain ("K. Fountain"), Defendant's aunt, stated that Defendant had children by four different women and that she had relationships with all of them and their children. She testified that Defendant's children all ask when their dad is coming home and want to talk to him. Id. at 46-48.

Defendant spoke next on his own behalf. He apologized "for this whole situation" and asked this Court to consider everything his family members said on his behalf. He stated that he would "accept responsibilities and, you know, accept what you got in store for me, Your Honor." Id. 48-49.

This Court sentenced Defendant as follows:

CP-51-CR-0002320-2018 (5-mo-old victim Za.S.):
Aggravated assault:                     44 to 120 months
Endangering Welfare of Child:           44 to 120 months (to run consecutive)

CP-51-CR-0002318-2018 (victim Domenique Starks):
Terroristic Threats:                    17 to 60 months
Criminal Trespass:                      17 to 60 months (to run consecutive)
Simple Assault:                         No Further Penalty[2]

CP-51-CR-0002319-2018 (10-year-old victim Z.S.):
Endangering the Welfare of a Child:     24 to 48 months

CP-51-CR-0002321-2018 (9-year-old victim N.S.):
Endangering the Welfare of a Child:     24 to 48 months

This resulted in an aggregate sentence of 105 to 300 months (or 8.75 to 25 years) state incarceration, with credit for time served. This Court ordered Defendant to earn his GED, complete job training, complete drug and mental health treatment, undergo anger management treatment, and attend parenting classes. Upon release, this Court ordered Defendant to seek and maintain employment, pay mandatory

---

[2] See FN 1.

11

court costs and fees, and stay away from all three children involved in this matter except as facilitated through the Support Center for Child Advocates. Id. at 49-57.

## ISSUES

I.    WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

II.   WHETHER THE SENTENCE IMPOSED WAS HARSH AND UNREASONABLE.

III.  WHETHER THE COURT ERRED "IN ALLOWING THE COMMONWEALTH TO INTRODUCE TWO PRIOR BAD ACTS UNDER PA.R.E. 404(B) INTO EVIDENCE STEMMING FROM PREVIOUS ALLEGATIONS OF DOMESTIC VIOLENCE BETWEEN THE DEFENDANT AND THE COMPLAINANT AS THE PREJUDICIAL VALUE OUTWEIGHED THE PROBATIVE VALUE.

IV.   WHETHER THE COURT ERRED WHEN IT ALLOWED "THE COMMONWEALTH TO INTRODUCE TWO PRIOR BAD ACTS INTO EVIDENCE IN THAT NOTICE WAS NOT GIVEN TO THE DEFENSE PURSUANT TO PA.R.E. 404(B)(3).

## DISCUSSION

## I.    THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

Defendant's claim that the verdict was against the weight of the evidence is meritless. In his motion, Defendant argues that the witnesses admitted to lying about "a crucial detail of the case," i.e. that he had a gun, and that "the lack of physical evidence that any assault occurred calls into doubt the sufficiency of the evidence presented by the Commonwealth, such that it shocks the conscience and undermines that efficacy of the tribunal." Defendant's "Post Sentence Motions," 5/31/21, p. 4.

The law for reviewing a weight of the evidence challenge is well settled:

> When reviewing a challenge to the weight of the evidence, we review "the trial court's exercise of discretion." Commonwealth v. Johnson, 192 A.3d 1149, 1152-53 (Pa.Super. 2018) (citing Commonwealth v. Hicks, 151 A.3d 216, 223 (Pa.Super. 2016) ). A reversal of a verdict is not necessary

12

> "unless it is so contrary to the evidence as to shock one's sense of justice."
> Id. at 1153. "The weight of the evidence is exclusively for the finder of
> fact, who is free to believe all, none or some of the evidence and to
> determine the credibility of the witnesses." Commonwealth v. Cramer, 195
> A.3d 594, 600 (Pa.Super. 2018) (citation omitted). The fact-finder also has
> the responsibility of "resolving contradictory testimony and questions of
> credibility." Id. (citation omitted). We give great deference to the trial
> court's decision regarding a weight of the evidence claim because it "had
> the opportunity to hear and see the evidence presented." Id. (citation
> omitted).

Commonwealth v. Roane, 204 A.3d 998, 1001 (Pa.Super.2019). "One of the least assailable

reasons for granting or denying a new trial is the lower court's conviction that the verdict was or

was not against the weight of the evidence and that a new trial should be granted in the interest

of justice." Commonwealth v. Clay, 619 Pa. 423, 432, 64 A.3d 1049, 1055 (2013)(quoting

Commonwealth v. Widmer, 560 Pa. 308, 321-22, 744 A.2d 745, 751-52 (2000).

In the case at bar, Starks, Z.S. and N.S. all testified that Defendant came to their home

angry, forced his way inside, and demanded his watch back. They testified that Starks was

holding her infant son Za.S. when Defendant began hitting her. Starks' testimony, corroborated

by police reports, showed that Defendant had a long history of physically abusing Starks;

however, Starks had been too afraid to go to court and assist the prosecution in any of these

cases. Indeed, Starks only appeared at Defendant's trial because she was taken into police

custody. (N.T. 2/1/19, p. 56-59). Starks, Z.S., and N.S. admitted to lying to the police about

Defendant having a gun, but Starks explained that they did so because they were angry and

unable to get the police's attention otherwise. (Id. at 17). The police officer who responded to the

scene testified that Starks appeared "shaken" and that her face and neck were covered in

scratches. Id. at 61-67. The Commonwealth also played a recorded prison phone call between

Defendant and Starks, in which Defendant told Starks that he did not mean to hit the baby. Id. at

32-37. As discussed above, the fact finder, in this case a jury, was free to believe all, part, or

none of the evidence and to determine the credibility of the witnesses. The jury, after hearing Starks, Z.S. and N.S.'s testimony, found them to be credible. The jury believed that Defendant busted into Starks' home, threatened to destroy property, and hit Starks and her baby. Based upon the witnesses' testimony, the scratch injuries on Starks' face and neck, the recorded prison phone call, and Defendant's long history of domestic violence, this verdict cannot be said to shock one's sense of justice. No relief is due.

## II. THE SENTENCE IMPOSED WAS NOT HARSH AND UNREASONABLE.

Defendant claims that the sentence imposed was harsh and unreasonable. This claim is without merit. Under Pennsylvania law, sentencing is a "matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." Commonwealth v. Ferguson, 2006 PA Super. 18, 893 A.2d 735, 739 (2006) (quoting Commonwealth v. Hyland, 2005 PA Super. 199, 875 A.2d 1175, 1184 (2005)). An abuse of discretion requires more than the showing of a mere error in judgment; rather, an appellant must demonstrate that the trial court was "manifestly unreasonable" or exercised judgment that was the result of "partiality, prejudice, bias, or ill-will." Commonwealth v. Griffin, 2002 PA Super. 203, 804 A.2d 1, 7 (2002). In other words, "[a]n abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support as to be clearly erroneous." Commonwealth v. Walls, 592 Pa. 557, 564-65, 926 A.2d 957, 961-62 (2007). The appellant must do more than just allege that the sentence imposed was excessive or harsh; by reference to the record, the appellant must show that the judge misapplied the law, showed bias, or made a manifestly excessive decision. Commonwealth v. Lee, 2005 PA Super. 160, 876 A.2d 408, 411 (Pa.Super.2005).

14

"[W]here a sentence is within the standard range of the [sentencing] guidelines, Pennsylvania law views the sentence as appropriate under the Sentencing Code." Commonwealth v. Moury, 992 A.2d 162, 171 (Pa. Super. 2010); see also Commonwealth v. Ventura, 975 A.2d 1128, 1135 (Pa. Super. 2009). Additionally, "[w]here the sentencing court had the benefit of a presentence investigation report ("PSI"), we can assume the sentencing court was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors." Id.

Pursuant to § 9781(c)(2) of the Sentencing Code, a reviewing appellate court "shall vacate the sentence and remand the case to the sentencing court with instructions if it finds: ... the sentencing court sentenced within the sentencing guidelines[,] but the case involves circumstances where the application of the guidelines would be clearly unreasonable[.]" 42 Pa. C.S.A. § 9781(c)(2). To determine whether a sentence is clearly unreasonable,

> the appellate court must consider the defendant's background and characteristics as well as the particular circumstances of the offense involved, the trial court's opportunity to observe the defendant, the presentence investigation report, if any, the Sentencing Guidelines as promulgated by the Sentencing Commission, and the 'findings' upon which the trial court based its sentence.

Commonwealth v. Coulverson, 34 A.3d 135, 147 (Pa. Super. 2011).

In the case at bar, this Court properly sentenced Defendant to an aggregate term of 105 to 300 months state incarceration after the jury found him guilty of aggravated assault, two counts of simple assault, terroristic threats, three counts of endangering the welfare of a child, and criminal trespass. The record shows that Defendant was sentenced as follows:

CP-51-CR-0002320-2018 (5-mo-old victim Za.S.):
Aggravated assault:                    44 to 120 months
Endangering Welfare of Child:          44 to 120 months (to run consecutively)

CP-51-CR-0002318-2018 (victim Domenique Starks):
Terroristic Threats:                   17 to 60 months

15

| Criminal Trespass: | 17 to 60 months (to run consecutively) |
| Simple Assault: | No Further Penalty[3] |

CP-51-CR-0002319-2018 (10-year-old victim Z.S.):
Endangering the Welfare of a Child:    24 to 48 months

CP-51-CR-0002321-2018 (9-year-old victim N.S.):
Endangering the Welfare of a Child:    24 to 48 months

This sentence was within the **standard** range of the sentencing guidelines and was reasonable in light of Defendant's history, the nature of the crime, and the impact on the victims.

The record shows that Defendant, who had a history of violent behavior, forced his way into Starks' home, threatened her and her children, and then hit her and their infant son she was holding. At sentencing, the Commonwealth noted that this was a years-long cycle of domestic violence between Defendant and Starks, and that three children were now involved in it. Starks had refused for years to come to court to testify against Defendant because she was so fearful of him; she only testified in this case because she was taken into custody and forced to do so. Child Advocate Todd McGarvey testified that the two girls, Z.S. and N.S., were anxious and fearful of Defendant continuing to hurt them or Starks. The Commonwealth stated that Defendant had been arrested 25 times in Philadelphia County, including several times for domestic violence against women other than Starks; was convicted on 8 prior occasions, which included a murder conviction; had been incarcerated 4 times; and had violated probation/parole on two occasions. In addition to Defendant's violent criminal history, he also failed to cooperate with the PSI and mental health evaluation, where he lied about his past and continued to deny the allegations of abuse against him. This Court stated at sentencing, "This situation of domestic violence has continued far too long with this particular family." (N.T. 4/2/19, p. 55). This Court implored Defendant to address his medical, mental health, and anger management issues while

---

[3] See FN 1.

incarcerated so that he could refrain from engaging in violent activity upon release. Id. at 55-56. Thus, the record demonstrates that this Court gave adequate consideration to the sentencing factors and properly sentenced Defendant to an aggregate term of 8 ¾ to 25 years state incarceration.

Defendant argues that this Court failed to "consider the progress that the defendant had made while at counseling for a prior conviction" and "the remarks of defendant's character witnesses at sentencing." These claims are without merit. The record shows that at sentencing, Defendant's prison medical case manager through the Philadelphia Linkage Program, Dina Gill, spoke, and indicated that she had been working with Defendant on a discharge plan, and she outlined the details of that plan, which included treatment and housing. Several character witnesses, including Defendant's mother, aunt, and pastor, spoke on his behalf, asking this Court for mercy. This Court listened to each witness and took their words into consideration when fashioning her sentence. Indeed, this Court stated to Defendant:

> Each victim deserves to have you serve a lot of time. And I could
> have sentenced you consecutive on every last one of them, but I
> didn't do that. Because see, you and your family asked me for
> compassion and mercy. And the way that I showed that was to not
> sentence you consecutive on everything. Okay?
>
> Just so you understand you got mercy today, you got consideration
> today, but you're not going to walk out of here today. Do you
> understand that? You think it's okay to go around beating around
> on women? No, it's not.

Id. at 62. After considering the nature of the crime, the negative impact on the victims, Defendant's long history of violent behavior, and the safety of the community, this Court found it appropriate to sentence Defendant to an aggregate term of 8 ¾ to 25 years state incarceration. This judgment of sentence should be affirmed.

**III. THIS COURT PROPERLY PERMITTED THE COMMONWEALTH TO INTRODUCE EVIDENCE OF PREVIOUS ALLEGATIONS OF DOMESTIC VIOLENCE BETWEEN THE DEFENDANT AND THE COMPLAINANT.**

Defendant claims that this Court should not have permitted the Commonwealth to introduce evidence of previous allegations of domestic abuse between Defendant and Starks, arguing that the prejudicial value of this evidence outweighed the probative value. This claim is without merit.

Questions regarding the admissibility of evidence are within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. Commonwealth v. Belknap, 105 A.3d 7, 9-10 (Pa. Super. 2014)(citing Commonwealth v. Brown, 617 Pa. 107, 52 A.3d 1139, 1197 (2012)). "An abuse of discretion is not merely an error in judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." Id. at 10 (quoting Commonwealth v. Mendez, 74 A.3d 256, 260 (Pa.Super.2013). The threshold inquiry with admission of evidence is whether the evidence is relevant. Stokes, 78 A.3d at 654. (quoting Commonwealth v. Robinson, 554 Pa. 293, 304-305, 721 A.2d 344, 350 (1998). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." Id.

Pursuant to Pa.R.E. 404(b), evidence of other crimes, wrongs or acts may be admissible for the purposes of "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Evidence of this kind may also be admissible under the *res gestae* exception, "where such evidence became part of history of the case and formed part of the natural development of facts." Commonwealth v. Ivy, 146 A.3d 241, 251,

18

(Pa.Super.2016)(citing Commonwealth v. Solano, 129 A.3d 1156, 1178 (Pa.2015)). In criminal matters, "this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b).

Evidence of prior abuse between a defendant and an abused victim is generally admissible to establish motive, intent, malice, or ill-will. Ivy, 146 A.3d at 252, (Pa.Super.2016) (citing Commonwealth v. Jackson, 900 A.2d 936, 940 (Pa.Super.2006)). There is no set time limitation on when evidence of prior abuse is no longer probative and admissible. Jackson, 900 A.2d at 940 (citing Commonwealth v. Drumheller, 570 Pa. 117, 136-37, 880 A.2d 893, 904 (2002)). Additionally, the Pennsylvania Supreme Court has held that "the trial court is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." Ivy, 146 A.3d at 252 (quoting Commonwealth v. Hairston, 624 Pa. 143, 84 A.3d 657, 666 (2014); Commonwealth v. Lark, 518 Pa. 290, 543 A.2d 491, 501 (1988)).

In the case at bar, this Court properly granted the Commonwealth's prior bad acts motion because the previous instances of domestic abuse were important to establish "motive, intent, malice, or ill-will," and evidence of Defendant's and Starks' ongoing violent and tumultuous relationship had "become part of the history of the case and formed part of the natural development of facts." It was relevant to show how their relationship had developed and evolved, and rebutted any false inferences raised by the defense as to fabrication. It also explained Starks' reluctance to cooperate with the prosecution. Indeed, the two prior instances of abuse were not prosecuted because Starks was too afraid to appear to testify. She only testified in this matter because she was taken into custody by police and forced to do so. All of this evidence

19

was necessary for the jury to have a complete picture of Defendant's and Starks' relationship as well as Starks' state of mind. As stated above, there is no requirement that the trial court sanitize "all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." Ivy, *supra*. Rather, it was crucial for the jury to know the ongoing violent trajectory of Defendant and Starks' relationship in order to place the instant matter into context. Accordingly, no relief is due.

**IV.  THE COMMONWEALTH PROVIDED SUFFICIENT NOTICE OF ITS INTENT TO INTRODUCE EVIDENCE OF PREVIOUS ALLEGATIONS OF DOMESTIC VIOLENCE BETWEEN DEFENDANT AND THE COMPLAINANT.**

Last, Defendant claims that the Commonwealth did not provide sufficient notice of its intent to introduce evidence of prior bad acts at trial. This claim is without merit. Pursuant to Pa.R.E. 404(b)(3), "[i]n a criminal case the prosecutor must provide reasonable written notice in advance of trial so that the defendant has a fair opportunity to meet it, or during trial if the court excuses pretrial notice on good cause shown, of the specific nature, permitted use, and reasoning for the use of any such evidence the prosecutor intends to introduce at trial." The purpose of this rule is to "prevent unfair surprise and give defendants time to prepare an objection or rebuttal." Commonwealth v. Hicks, 625 Pa. 90, 101, 91 A.3d 47, 54 (2014). However, "there is no requirement that the 'notice' must be formally given or be in writing in order for the evidence to be admissible." Commonwealth v. Lynch, 57 A.3d 120, 126 (Pa.Super.2012) (citing Commonwealth v. Mawhinney, 915 A.2d 107, 110 (Pa.Super.2006)). Indeed, as the rule itself states, the trial court may excuse pretrial notice upon good cause shown. Id.

In the case at bar, the Commonwealth sought to introduce instances of past domestic violence between Defendant and the complainant, Starks. The record shows that on the morning

20

of trial, the Commonwealth informed this Court that it was seeking to admit two specific instances of prior domestic violence between Defendant and Starks in order to show the "natural basis of their relationship as it evolved over time," and to show Defendant's common plan, scheme or design. Defense counsel objected, arguing that he had not been provided with reasonable notice as the Commonwealth had handed him a copy of the motion at 9:25 am. The Commonwealth replied that it was unable to prepare the motion any sooner because Starks had been hostile and uncooperative, and that the prosecution had been unable to speak with her until she was taken into custody the day before. This Court then asked defense counsel whether he had known about these two domestic violence incidences from 2012 prior to trial and he replied that he had been aware of them as they were part of Defendant's criminal extract. This Court granted the Commonwealth's motion, finding that introducing this type of evidence, which appeared to be a continuing pattern of violence, would not be a surprise in another case involving domestic abuse. (N.T. 1/30/19, p. 8-19). As stated above, the trial court may excuse pretrial notice when good cause is shown. Here, the Commonwealth provided good cause when it explained it had been unable to even speak with Starks prior to trial because she was so hostile, and that she did not cooperate with them in order to prepare the motion until she was arrested the day before, and forced to do so. In addition, defense counsel already was aware of these previous instances of domestic assault and could not have been surprised that they might be introduced in a subsequent domestic violence case involving the same individuals. Accordingly, this Court properly excused pretrial notice and no relief is due.

21

## CONCLUSION

After reviewing the applicable case law, statutes, and testimony, this Court committed no error. The verdict was not against the weight of the evidence. This Court properly sentenced Defendant to an aggregate term of 105 months to 25 years state incarceration. Last, this Court properly granted the Commonwealth's Prior Bad Acts motion. Accordingly, this Court's judgment of sentence should be affirmed.

BY THE COURT:

_____

J.

22